Burke, J.
Aaron Dworetz, John Arnold and Harvey Kaliff purchased a large peninsula of land in South Bellmore, New York, in 1959 for construction purposes. At that time, the peninsula was marshland, covered with spongy, compressible bog. In reclaiming the land, a dredging operation was necessary to fill it to the required grade. Defendants Dworetz, Arnold and Kaliff began this operation by obtaining a permit from Army engineers to dredge the waters off the peninsula. A second permit was issued by the Hempstead Town Board to dredge and fill 250,000 cubic yards. A subsequent modification increased the authorized dredge to 900,000 yards and extended the permit to February 18, 1962.
While the dredging and filling operation was progressing, defendant processed and filed subdivision maps covering the land. The area was divided by their engineering assistants into 12 sections, composed of 282 lots and the accompanying street profiles. Sections 1 through 7, located in the northern (and inland) portion of the peninsula, were then developed by Harno Construction Corp., a building corporation formed by Dworetz and his associates. Defendant Harno built and sold 126 houses in these sections. The remainder of the development, consisting of 156 lots and constituting the subject matter of this appeal, was listed with a real estate broker as filled, improved lots, located on filed maps. The broker contacted Salvatore Ingrassia, a builder of several developments on Long Island, and told him of this land which was ‘ ‘ fully improved, filled to grade” with “maps filed” and “bonded.” Ingrassia inspected the peninsula and found the northern portion in the process of development. While dredging operations were concluding at that time, the southern area, which was being offered to Ingrassia, was in a totally undeveloped state. Huge piles of hydraulic fill, separated by valleys, made it impossible to determine by mere observation whether the fill, when leveled, would be sufficient to complete the development. Thus, Ingrassia could not verify the agent’s assertion that he was selling “ filled to grade ” lots.
Ingrassia expressed an interest in the land and negotiations commenced with the defendants Dworetz, Arnold and Kaliff. After some discussion, the price for these filled to grade plots was set at $6,300 for the inland parcels and $8,000 for beach *117 plots. The parties met in February, 1962 to sign the contract, confirming the negotiations. At that time, plaintiff Ingrassia requested an engineer’s certification that there was enough fill and that the sellers specify in the contract that these were ‘ * legal building plots. ’ ’ The engineering concern was unwilling to phrase the certification in the terms suggested by plaintiff Ingrassia and the defendants found the description ‘ ‘ legal building plots ” unacceptable so, after a six hour conference, the negotiations broke off. However, on March 14, 1962, the parties met again, at which time the sale was concluded. On that date, Ingrassia was given an engineer’s certification that ‘ ‘ there is adequate material on the site to grade all streets in conformance with the approved street profiles and to grade all plots in conformance with the minimum requirements of the Town of Hempstead.” Plaintiff had requested a certification that there was enough fill to complete the job. Unwilling to rely solely upon the above representation, plaintiff’s attorney insisted that a clause be included in the contract, in which the seller would guarantee the land to the purchaser. The following was acceptable to all parties: “ The Sellers represent that the property hereinbefore described, at the time of closing, shall be 156 legal building plots ” (emphasis added). A handwritten addition provided the assurance that this representation would survive delivery of the deed. The closing took place on August 21, 1962. At that time various ordinances of the Town of Hempstead dealt with reclaimed land. Two such ordinances are pertinent to this appeal. One dictated the quantity of fill to be used in reclaiming land and the other specified a minimum slope for the shoreline of all waterfront or beach parcels of land. Sometime after the conclusion of this transaction, it became apparent that the land contained insufficient fill and that the shoreline was not properly sloped. The present action followed these discoveries. In a comprehensive complaint, Ingrassia and the building corporation he later formed for the purpose of developing the area — Jo Arm Homes at Bellmore—sued the sellers and the engineering firm that had provided the certification[1]. Plaintiffs alleged that defendants *118 Dworetz, Arnold and Kaliff were liable for breach of contract and fraud and, after a lengthy jury trial, prevailed on both theories. Special findings were made and the jury concluded that damages suffered by plaintiffs on the beach plots totalled $81,600 and that the loss incurred for the inland plots was $51,300. An additional award of $19,363 was made because of the defendant’s delay. While plaintiffs were awarded identical verdicts for the inland and beach plots on the different theories of contract and fraud, the maximum liability of the defendants as a result of the jury verdict was $152,263.
Following the jury verdict, the trial court struck the delay damages and the award for breach of contract with reference to the inland plots from the judgment. After an appeal to the Appellate Division, Second Department, the award was again reduced when that court dismissed the fraud cause of action because of insufficient proof of scienter. However, the breach of contract award of $81,600 for the beach plots was sustained.
Both parties appeal to this court. Defendants Dworetz, Arnold and Kaliff seek, quite naturally, to have the contract cause of action dismissed. Plaintiffs, on the other hand, request the reinstatement of both the fraud cause of action and the award of $19,363 for delay damages.
One additional cause of action in plaintiffs’ complaint, not previously discussed, sought a declaration that the mortgage given to the defendants by the plaintiffs was invalid because of the alleged fraudulent representations of these defendants. At that time, the defendants instituted a foreclosure action against Jo Ann Homes, Inc. on this same mortgage. The foreclosure action and the cause of action seeking a declaration of illegality were tried jointly with the damage causes of action and resulted in the dismissal of the declaratory action on the ground that plaintiff had been fully compensated by the jury verdict, and in a judgment against Jo Ann Homes in the foreclosure action. The Appellate Division, Second Department, affirmed that judgment and we granted leave to appeal, so that the entire controversy might come before this court. In the foreclosure action, Jo Ann Homes concedes that, should we fail to reinstate the iraud cause of action, the appeal from the judgment of foreclosure becomes academic.
*119 Upon reviewing the record in this case, we conclude that plaintiff presented evidence to the jury which was sufficient to establish each of the elements of a cause of action in fraud for both the inland and the beach plots. Except for this modification, the orders of the Appellate Division should be affirmed.
Fraud is generally defined by reciting the five elements essential to sustain that cause of action. There must be a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury. (See 24 N. Y. Jur., Fraud and Deceit, § 14.) There is an abundance of evidence in this case which would permit a jury to conclude that the defendant did in fact make such a fraudulent misrepresentation to the plaintiff.
Salvatore Ingrassia repeatedly testified that he concluded this transaction only after he was assured in writing that he was purchasing “legal building plots.” Ingrassia, an experienced builder, contends his interest in the land was attributable to the many representations that it was ready for development. As he testified, when he first expressed an interest, it was as the result of a representation that the land was ‘ ‘ fully improved, filled to grade ” with “ maps filed ” and “ bonded.” Moreover, he points out that it would indeed be wasteful for a purchaser to pay a premium for beach plots, without first receiving some guarantee that the plots actually met the requirements of beach plots. His reluctance to proceed with the matter was not diminished when the engineering firm which had done the dredging refused to warrant that there was sufficient fill.
It is noteworthy that Ingrassia received several oral representations concerning the sufficiency of the fill in the course of these negotiations, and that he rejected them as inadequate. Instead, he continually requested the inclusion of such a representation into the contract. His persistency resulted in the contractual declaration that he was purchasing ‘[1]156 legal building plots ”.
The critical question then arises—what is the meaning of that representation? Defendants contend the phrase merely assured Ingrassia that the plots would meet the existing area restrictions of the Town of Hempstead for one-family dwellings. *120 Such an interpretation is unacceptable in light of the nature of the property conveyed and in view of the negotiations which preceded the contract. Ingrassia testified that the representation “ legal building plots ” was intended to cover not only the area, but the depth of the plots and, in the case of the beach property, proper shoreline sloping. While the parties now dispute the meaning of the phrase ‘[1] legal building plot ’ ’, the jury was offered evidence from which it could be concluded that the representation was, in fact, intended to guarantee the sufficiency of the fill and the existence of proper shorelines.
The remaining elements of the cause of action are clearly present in this case. However, since the Appellate Division was of the opinion that scienter had not been established, we will comment briefly on the evidence from which the jury concluded that the defendants either knew, or should have known, that the fill was inadequate when the contract was executed. At the time of the contract’s execution, the dredging operation had been completed and Harno Construction Corp. was actively engaged in the development of the northern portion of the peninsula. In the fall of 1961, Harno was informed by its engineers that the fill distributed over the land was proving to be inadequate as it “ had settled away perhaps some six to ten inches from * * * original elevations.” The land which was later conveyed to Ingrassia was known to contain approximately twice the bog as the area then under development. Since the difficulty of reclaiming the land increased in direct proportion to the amount of bog, the defendants should have concluded that the fill initially apportioned to the contracted area would also prove to be inadequate.
There is evidence in the record that the defendants, prior to the signing of the contract, finally abandoned their initial plan for land reclamation. The change in plan provides support for plaintiff’s contention that the defendants had abandoned their original plan because of its proven ineffectiveness. Having found the fill inadequate in one area, defendants should have known that it would also be insufficient in sections 8 through 12. Finally, just one month before the contract was signed, the defendants received a report from their engineering concern wherein they indicated that they could not certify that there was enough fill to complete the job. A topographical survey was prepared and there is evidence which indicates that the *121 defendants then moved considerable quantity of fill from the southern area to the Harno construction sites in an attempt to properly fill that area. This activity preceded and accompanied the signing of the contract. The cumulative nature of this evidence sufficiently demonstrates that the defendants knew, or should have known, of the inadequacy of the fill, prior to the signing of the contract.
Having sustained the fraud action, the contract action becomes academic for, as noted earlier, plaintiffs’ maximum recovery was established by the jury at $132,900 and plaintiff’s causes of action for fraud provide for a recovery in that amount. In examining that claim, it becomes apparent that the breach of contract with reference to the beach plots can hardly be disputed. Defendants had incorporated the filed maps into the contract. Those maps indicated that the beach plots were sloped in accordance with the town’s existing requirements. In effect, this was another representation relating to the beach plots. As we have indicated above, these plots were neither filled sufficiently nor sloped properly. The proof required to sustain the fraud cause of action is far more demanding than that needed to prove a breach of contract. Without engaging in a repetitive discussion of the facts, we merely declare that the contract cause of action was established and should be sustained.
Plaintiffs also request that we reinstate the award for consequential or delay damages in the amount of $19,363, which award was stricken by the Trial Judge. The delay was caused by a town ordinance, enacted after the contract was executed, which was designed to discourage the use of beaches, and instead provided for the construction of seawalls or bulkheads on waterfront properties. Had the property been properly sloped at the time of contract, it is not disputed that the ordinance would not have applied. However, the Trial Judge was of the opinion, in striking the award, that plaintiffs could still have avoided the impact of that ordinance since it recited that it would not apply ‘ ‘ Where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the provisions ”. His determination was affirmed by the Appellate Division and, in view of the language of this ordinance, we cannot declare, as a matter of law, that the ensuing delay in the development of the beach properties was *122 attributable solely to the defendants’ inability to convey properly sloped plots.
Finally, we come to the foreclosure action. This was a separate proceeding successfully initiated by the defendants. Plaintiffs now contend that the doctrine of "unclean hands” should prevent the defendants from proceeding with the foreclosure. Concededly, a foreclosure action is a “ proceeding in a court of equity which is regulated by statute. ” (Dudley v. Congregation of St. Francis, 138 N. Y. 451, 457; see, also, Amherst Factors v. Kochenburger, 4 N Y 2d 203) Nevertheless, it is well settled that such a proceeding is unlike other equity actions in several ways. Thus, while equity acts only in personam, an action for foreclosure “is in the nature of a proceeding in rem to appropriate the land ”. (Reichert v. Stilwell, 172 N. Y. 83, 89.) Just as this court sustained the legality of a mortgage where the note was illegal (Amherst Factors v. Kochenburger, supra), we now conclude that a mortgage may not be set aside solely because the underlying transaction was tainted by a fraudulent representation. The trial court, which was the court of equitable jurisdiction in this instance, chose not to sustain the defense of fraud in the foreclosure proceeding and neither common sense nor precedent warrants a contrary determination.
To conclude, upon the appeals as of right, the order of the Appellate Division should be modified by granting a new trial on the fraud cause of action, with costs to abide the event, and, as modified, affirmed. Upon the appeal taken pursuant to leave granted by this court, the orders of the Appellate Division should be affirmed, with costs.
In case No. 1:
Chief Judge Fuld and Judges Scileppi and Jasen concur with Judge Burke ; Judges Bergan and Breitel dissent and vote to affirm.
Order modified by granting a new trial on the fraud cause of action, with costs to abide the event, and, as so modified, affirmed.
In case No. 2:
Chief Judge Fuld and Judges Scileppi, Bergan, Breitel and Jasen concur.
Orders affirmed, with costs.

. Plaintiff recovered a judgment of $22,213.67 against the engineering concern. This jury verdict was affirmed by the Appellate Division and has not been appealed to this court.