**HELMSLEY–SPEAR, INC., Plaintiff,**

**v.**

**WESTDEUTSCHE LANDESBANK GIROZENTRALE, individually and as agent, Nova–Park New York Inc. N.V., NP Holding N.V., Deutsche Anlagen–Leasing GmbH, DAL Multinational Leasing GmbH, Bayerische Landesbank Girozentrale, Landesbank Rheinland–Pfalz Und Saar International SA, Dresdner Bank AG, Defendants.**

No. 86 Civ. 7759 (RWS).

United States District Court,
S.D. New York.

July 14, 1988.

As Amended July 25, 1988.

---

Wien, Malkin & Bettex, New York City (Robert A. Machleder, Dayna K. Langfan, of counsel), for plaintiff.

Shearman & Sterling, New York City (Kenneth M. Kramer, Lorraine K. Rak, Robert F. Mace, of counsel), Stanley S. Arkin, P.C., New York City, (Robert J. Hausen, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants Westdeutsche Landesbank Girozentrale ("West LB"), Bayerische Landesbank Girozentrale, Hessische Landesbank Girozentrale, Landesbank Rheinland–Pfalz und Saar International SA, and Dresdner Bank AG (collectively, the "Banks") and defendants Deutsche Anlagen–Leasing GmbH ("DAL"), DAL Multinational Leasing GmbH ("DALM"), N.P. Holding N.V. and Nova–Park New York Inc. N.V. ("NPNY") have moved for summary judgment under Rule 56, Fed.R. Civ.P., to dismiss the complaint of plaintiff Helmsley–Spear, Inc. ("Helmsley–Spear"). Helmsley–Spear has cross-moved for summary judgment on its complaint. Upon the findings and conclusions set forth below, the motion of the Banks and their affiliates is granted with respect to Helmsley–Spear's claims other than its quantum meruit and unjust enrichment claims as to which the Banks' motion is denied and Helmsley–Spear's cross-motion is granted.

### Prior Proceedings

The complaint alleging five causes of action was filed in Supreme Court, New York County on September 19, 1986, and the action was removed to this court on October 8, 1986. The first cause seeks a commission based upon an agreement between the parties, the second alleges fraudulent inducement and seeks rescission and reformation, and the third, fourth and fifth claims seek recovery for Helmsley–Spear under theories of implied contract, quantum meruit, and unjust enrichment. Following the completion of discovery, the parties moved for the relief here described on January 21, 1988. The motions were fully submitted on March 25, 1988.

### The Facts

Helmsley–Spear is a corporation that specializes in providing consulting and brokerage services with respect to New York City real estate. During the events at issue here, Helmsley–Spear was represented by a team of brokers and salesmen that consisted of James O. Boisi ("Boisi"), Sidney Michael Rogers ("Rogers"), Scott C. Coopchik ("Coopchik") and Lee Weissman ("Weissman"). The Banks are European banking institutions, and DAL, DALM and NPNY are German and Netherlands Antilles corporations that were affiliates of the Banks during the time of Helmsley–Spear's retention.

In 1981 and 1982, the Banks and DAL made loans totalling approximately $55,000,000 to NPNY and its parent, Nova Park AG ("NPAG"), to finance NPNY's renovation of the Gotham Hotel, located at 700 Fifth Avenue in New York City (the "Gotham"). NPNY had acquired a 99–year lease on the Gotham in 1979 from Sol Goldman and Irving Goldman (the "Goldmans"), and a Swiss hotelier, Rene Hatt ("Hatt"), sought to restore the Gotham as a world class hotel. The renovation was mismanaged and went substantially over its budget.

To finance the cost overruns, Hatt negotiated a second mortgage from Flushing Federal Savings and Loan Association ("Flushing Federal") for $45,000,000. In January 1984, after advancing only $5,000,000, Flushing Federal refused to complete its commitment. By the end of March 1984, the financial situation of the Gotham was being preserved solely by the Banks' payment of NPNY's debts, and the lease was about to be terminated unless another $6,000,000 was infused immediately into the project. By April 1984:

Construction had been halted for approximately eight months;

NPNY had failed to meet four monthly rental payments totaling approximately $1,560,000. The Goldmans issued a notice of default for the January 1984 rent and pursuant to that notice the lease was to be terminated on or about April 20, 1984;

NPNY had received another default notice from the Goldmans listing 20 mechanics' liens, aggregating over $4,600,000, which, unless paid or provided for by approximately April 20, 1984, would also cause a termination of the lease;

NPNY had suffered three default judgments by creditors aggregating approximately $3,000,000 and enforcement proceedings were underway;

NPNY owed approximately $688,000 in back taxes to New York City;

Flushing Federal had commenced a foreclosure action against the Gotham and had also attempted to seize and auction the furnishings for the hotel; and

NPNY was in default in repaying the loans from the Banks and DAL.

As a result of the Goldmans' threatened April 20 termination of the Gotham lease, NPAG and the Banks reached an accommodation that is represented by an agreement dated April 16, 1984 (the "April 16 Agreement"). By the terms of the April 16 Agreement, NPAG transferred to a subsidiary of DALM, NP Holding, N.V., all of its shares of NPNY stock. The parties also exchanged mutual releases dated as of April 16, 1984. In return, the Banks agreed to give NPAG a 35–business day grace period until June 11, 1984, within which time NPAG was obligated to repurchase all NPNY shares for $35,000,000 by purchasing all the shares of NPNY's new parent company, NP Holding N.V.

During the three months before June 11, 1984, the Banks and DAL had a series of discussions with Helmsley–Spear representatives who were advised of the background of the April 16 Agreement under which the Banks and DAL had obtained temporary control over the Gotham. Helmsley–Spear was told that the Banks and DAL would be free to dispose of the Gotham if NPAG did not repurchase the hotel by the June 11 buy-out deadline. Helmsley–Spear also learned that mechanics' liens had been filed against the Gotham and that Flushing Federal held a $5 million lien for its partial loan.

One of the Helmsley–Spear representatives, Coopchik, described the Gotham at the time in deposition testimony as follows:

... the front of the hotel was boarded up; people had put posters on it, graffiti was written on it. There were wires hanging out of the hotel, literally out of the window, running down the side of the building. There were missing windows. There were homeless people living on the steps on 56th Street. Vendors had dropped things off and literally just dropped them off, like on the sidewalk, not even in the building. From the outside it was a mess.

If you could avoid walking in front of it you would have crossed the street and walked on the side.

NPAG's buy-out deadline was extended to June 13, 1984, and on that date NPAG defaulted on its repurchase obligations. The next day, June 14, 1984, representatives of DAL and the Banks met with Rogers, Coopchik and Weissman and advised them that the buy-out had not occurred and that the former owners might well litigate over their loss of the hotel. Helmsley–Spear was also apprised of the opinion of the Banks' legal advisors that such a suit would not likely result in a *lis pendens* or similar encumbrance being filed against the Gotham. In fact, on August 21, 1984 while the Banks' representatives were in Germany, Hatt commenced a lawsuit against the Banks in New York Supreme Court.

After obtaining control over the Gotham, the Banks began to incur approximately $600,000 a month in carrying costs for the hotel and over $250,000 a month in lost interest and was required to expend additional funds to clear up the numerous problems existing at the time they obtained control. Over 50 mechanics' liens were removed and the underlying claims settled and paid. Numerous unsecured vendors' claims were similarly settled and paid, and steps were taken to defend against other claims that appeared unfounded. Approximately $3,000,000 in outstanding default judgments were settled or satisfied. The back taxes were paid and rent payments were brought current.

During this period, the Banks represented to Helmsley–Spear that they had good, marketable and unencumbered title to the property and that Flushing Federal had asserted a lien on old hotel personal property warehoused somewhere in New Jersey. On October 10, 1984 they disclosed that litigation had been commenced by Hatt against the Banks in August, and on October 14 advised Helmsley Spear that the relationship with the ground lessor was a good one. The nature of the Hatt litigation had also been described on October 4, 1984 in a telephone conversation between Boisi and Dr. Michael Weiss ("Weiss"), Vice President of West LB who had been assigned by his bank to the workout of the loans made to NPAG and NPNY, but Weiss' description was not complete and, therefore, not entirely accurate.

Following the June 14, 1984 meeting, Helmsley–Spear commenced efforts to study and then actively to market the Gotham. In July and August 1984, West LB had obtained permission from each of the Banks to enter into a formal agreement with Helmsley–Spear. On July 13, 1984, Rogers sent a letter to Gunther Glatzel ("Glatzel") of DAL which included Helmsley–Spear's proposed terms for a brokerage agreement. On August 3, 1984, the Banks replied by telex with revised terms which, with minor exceptions, were included in the formal agreement. The formal written agreement, dated August 23, 1984, was signed and sent by Helmsley–Spear to the Banks by letter dated August 30, 1984 and returned to Helmsley–Spear fully signed on October 1, 1984 (the "Agreement").

Paragraph 1 of the six-page Agreement grants to Helmsley–Spear the "exclusive right to sell" the Gotham during the term of the Agreement. Paragraph 2 defines the term as running for 6 months, from August 23, 1984 to February 22, 1985. Paragraph 8 grants to the Banks the right to reject any proposals, to conduct any negotiations and to withdraw the property from sale. Paragraph 14 provides for the payment of a retainer fee to Helmsley–Spear of $50,000 per month for six months, payable on the 23rd of each month from August 23, 1984 to January 23, 1985, a "Base Incentive Fee," based on the price of a sale, and an "Additional Incentive Fee," based on the timing of a sale contract's signing, as follows:

|  | Additional Incentive Fee |
|---|---|
| If signing of a sale contract takes place prior to November 23rd, 1984 | $300,000 |
| If signing of a sale contract takes place from November 23—December 22, 1984 | $200,000 |
| If signing of a sale contract takes place from December 23—January 22, 1985 | $100,000 |

To date, the Banks have paid Helmsley–Spear $300,000 in monthly fees pursuant to Paragraph 14 of the Agreement.

Paragraph 14, subparagraph (c) of the Agreement provides that no "Base Incentive Fee" or "Additional Incentive Fee" is payable to Helmsley–Spear "unless the sale contemplated by a sales agreement which shall have been duly executed during the term of this [Brokerage] Agreement shall have been consummated in accordance with such sales agreement and the consideration shall have been paid out." In addition, a sale contract executed within 60 days of the Agreement's termination is deemed executed during its term if, in the period just preceding termination, Helmsley–Spear has been in active and continuous negotiations with the purchaser and has notified the Banks thereof. Finally, paragraph 17 provides for termination and grants to the Banks the right to cancel upon 10 days notice and the payment of expenses, retainer fees and a cancellation fee of $300,000.

On November 7, 1984, Helmsley–Spear recommended that the Banks undertake negotiations with a group headed by Arthur Cohen ("Cohen"), which had submitted a written offer, dated November 1, 1984, to purchase the Gotham for $45,000,000, all cash. A draft contract of sale was presented to Cohen on December 6, 1984, and the Banks undertook direct negotiations with Cohen later that month.

A series of events in December 1984 and January and February 1985 followed these initial negotiations with Cohen. On December 13, 1984, the Goldmans commenced an action to terminate the lease because of NPNY's alleged failure to keep the Gotham in good repair. Although the Goldmans had, in the prior 12 months, served several notices of default which had all been withdrawn or cured, no notice of default preceded this lawsuit. In December the Banks also learned that the Gotham's former owners had executed an unauthorized and invalid contract to sell the Gotham, dated September 10, 1984. A memorandum of this contract of sale was recorded against the Gotham's title.

On January 17, 1985, the Gotham's former owners obtained an *ex parte* temporary restraining order which prohibited further attempts to sell the Gotham. The ensuing motion for a preliminary injunction was denied, and the temporary restraining order was lifted on February 14, 1985. On January 25, 1985, a French bank, Banque Worms SA, recorded a $13,315,000 mortgage against the Gotham executed on January 16, 1985. The mortgage was signed by NPNY's former owners. On February 14, 1985 Flushing Federal obtained an *ex parte* order appointing a receiver for the Gotham.

Helmsley–Spear had been instructed by the Banks that an integral feature of the sale of the property was the tax benefit to the purchaser in the form of investment tax credits, rehabilitation tax credits, and depreciation. Although paragraph 12 of the Agreement bound Helmsley–Spear to call these benefits to the attention of any potential purchaser without warranty on the part of the Bank, Helmsley–Spear's requests throughout the exclusive retainer period for information concerning these tax benefits went unanswered. Although Cohen desired a signed contract before the end of 1984 for tax reasons, the Banks' representatives did not meet with the potential purchaser until December 20, 1984, and neither Weiss nor Glatzel remained in New York during December 1984 and January 1985 to negotiate with Cohen despite Helmsley–Spear's requests. After Helmsley–Spear became aware of the existence of the Hatt lawsuit the Banks represented that they would offer full indemnities to a purchaser against divestiture of title and loss of business opportunity, but these assurances were not offered during the period of the Agreement. In mid-December 1984, the Banks reconsidered their decision to sell the property. Finally, in January 1985 on the advice of counsel, the Banks decided, again unilaterally, that they would only proceed to sale with a simultaneous contract and closing. However, their intention was not disclosed to Helmsley–Spear until late February or early March 1985.

By February 21, 1985, Cohen withdrew the November 1, 1984 $45,000,000 all-cash

offer. At a meeting in London, Cohen presented a revised $45,000,000 offer which included no cash at the closing and a purchase price to be paid in installments over a period of up to 12 years. The revised offer was reflected in a draft memorandum of understanding dated February 21, 1985 in which the purchaser was described as a legal entity with Cohen, Steven and Martin Goldstein, Steve Leber and George Rosenthal as principals.

On February 22, 1985 the exclusive retainer set forth in the Agreement terminated in accordance with its terms. Helmsley–Spear continued to work on the transaction during the automatic extension period which expired on April 23, 1985. Thereafter, at the Banks' request, during April, May, June and July 1985, Helmsley–Spear continued its efforts to market and sell the Gotham. On April 23, 1985, Dr. Han Willens ("Willens"), Chairman of the Board of DAL, travelled to New York on a fact-finding visit, met with Boisi and Coopchik and told Boisi that he wanted Helmsley–Spear to get the Cohen talks back on track and to pursue direct negotiations with another prospective purchaser, Equitable Insurance Realty Group.

In addition, Willens and Weiss called upon Boisi to remain in direct contact with Sol Goldman. Goldman, as the ground lessor, had a natural interest in acquiring the hotel and had been an early purchase prospect. Goldman had offered $15 million which Helmsley–Spear reported to the consortium on November 5, 1984, but that offer was of no interest to the Banks. In April 1985 Boisi elicited a $25 million offer from the Goldmans, which was reported to Weiss, and continued to remain in contact with the Goldmans about the Gotham until July 1985. Also in April 1985, Weiss consulted Boisi about an expression of interest in the hotel by Bass Brothers. At the same time, Coopchik was asked to confer with a Mr. Gottdiener who had shown interest in the property. In May and June 1985, Boisi attended numerous meetings with, among others, Cohen and William Zeckendorf, Jr. ("Zeckendorf") and Frank Stanton ("Stanton"). Weiss attended some of those meetings and received reports from Boisi on those he did not attend.

By May 14, 1985, Cohen had withdrawn its revised $45,000,000 offer and replaced it with an offer of $40,000,000. In addition, Zeckendorf and Stanton were represented as members of the Cohen group. On June 21, 1985, at the Omni Hotel in New York City, Cohen and other representatives of his group met with representatives of the Banks, DAL and Helmsley–Spear. At the end of the meeting, the negotiations were at an impasse. At that time, the group headed by Cohen included World–Wide Holdings Corp., Zeckendorf, Steve Leber, and Steven and Martin Goodstein. The purchase price being offered was $40,000,000. The June 21, 1985 meeting at the Omni Hotel was the last meeting at which Helmsley–Spear purported to represent the Banks and DAL, although Helmsley–Spear continued to make efforts in connection with the projected sale after that date. On July 8, 1985, Weiss informed Boisi by telephone that Helmsley–Spear would not be further compensated for its services.

Thereafter, the Banks and DAL received another offer from the Goldmans to buy the Gotham lease for $35,000,000. Helmsley–Spear did not know of this offer until an agreement in principle was reached.

The Gotham was sold on July 2, 1986 pursuant to an agreement dated as of June 27, 1986. Under the terms of this agreement, the Gotham was sold for $35,000,000 with $25,000,000 paid in cash at the closing and the remaining $10,000,000 secured by letters of credit. The purchaser was a Delaware corporation, the Imperial Hotel Corporation, and the constituent parties included the Goldmans, Cohen, Zeckendorf, Meelon Realty Corp., Pratt Hotel Corporation and Southmark Corporation. The Goldmans, Joel Pickett, Pratt Hotel Corporation and Southmark Corporation advanced 81% of the $10,000,000 in equity invested by the purchasing group and put up 81% of the $10,000,000 in letters of credit delivered by the purchasing group at closing.

*The Conclusions*

*Summary Judgment is Appropriate*

Summary judgment is not a "disfavored procedural shortcut but rather ... an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Rule 56 of the Federal Rules of Civil Procedure directs that summary judgment "shall be rendered forthwith if ... there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Under recent Supreme Court case law, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Genuine issues of material fact are those "that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. Thus, the summary judgment standard is similar to that of a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. As the Supreme Court has held, the "burden on the moving party [on a summary judgment motion] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

Here, the non-moving party has not taken issue with the facts stated above but with the inferences to be drawn from certain of the facts, particularly with respect to the claim of fraudulent inducement. Helmsley–Spear has itself sought summary judgment by way of cross motion stating in its sur-reply memorandum as follows:

The law is clear that where one party moves for summary judgment, the court to which the motion is addressed may *sua sponte* grant summary judgment to the non-moving party. In this circuit, a *sua sponte* award of summary judgment to the non-moving party has been sanctioned where it appears from the papers, affidavits and other proofs submitted by the parties that there are no disputed issues of material fact and that judgment for the non-moving party would be appropriate as a matter of law. *Morrissey v. Curran,* 423 F.2d 393, 399 (2d Cir. 1970), *cert. denied,* 399 U.S. 928, 90 S.Ct. 2245 [26 L.Ed.2d 796]; *Local 33, Int'l Hod. Carriers Union v. Mason Tenders Dist. Council,* 291 F.2d 496, 505 (2d Cir. 1961); *Denzer v. Purofied Down Products Corp.,* 474 F.Supp. 773, 774 (S.D.N. Y.1979).

Under these circumstances, except as noted below with respect to damages, summary judgment is appropriate.

*The Brokerage Commission*

Helmsley–Spear's principal claim is for the incentive payment under the Agreement and is based on its claim that but for the acts of the Banks, the Agreement would have been performed. However, any broker's commission must remain subject to the Agreement, and without regard to whatever effects the acts of the Banks may have had, the Agreement was not performed.

In *Heller & Henretig, Inc. v. 3620–168th Street, Inc.,* 302 N.Y. 326, 98 N.E.2d 458 (1951), a real estate broker and seller entered into a written brokerage agreement specifying that the broker was to receive no commission "if for any reason whatsoever the contract of sale shall not be executed or delivered." *Heller v. Henretig,* 302 N.Y. at 329, 98 N.E.2d 458. The broker presented testimony at trial that it had produced a purchaser who was ready, willing and able to sign a sale contract and that defendants arbitrarily refused to sign the contract. On appeal, the Court of Appeals reversed the Appellate Division's judgment in favor of the broker for commissions and dismissed the complaint. The

Court held that absent "proof of bad faith in the execution of [the brokerage] agreement," the broker was bound by its terms, and the reasons for seller's failure to execute the sale contract were irrelevant. *Id.* at 330, 98 N.E.2d 458. The Court reasoned that "[w]here ... the contracting parties have stated the terms of their agreement by language which makes clear their intention, our decision is governed by the rule that—'The construction of a plain contract is for the court' ... If the court finds as a matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the decision of the case." *Id.* In *Reiner v. Ellinger*, 29 Misc.2d 138, 216 N.Y.S.2d 560 (Sup.Ct.N.Y. Co.1961), *aff'd*, 17 A.D.2d 803, 232 N.Y.S. 2d 1022 (1st Dep't 1962) involving a similar dispute between a realty broker and seller, the court followed *Heller*, stating: "Read as a whole, however, the agreement indicates an intention that there was to be no liability for commissions if a written contract of sale was not executed, regardless of the reason therefor." *Reiner*, 216 N.Y. S.2d at 562.

Here, paragraph 14 of the Agreement provided that an incentive fee, *i.e.*, any fee in addition to the $50,000 monthly fee, was due Helmsley–Spear only if (1) a contract of sale were executed during the Agreement's term and (2) a sale was consummated pursuant to such a contract. Specifically, paragraph 14(c) of the Agreement provides:

> No base or additional incentive fee shall be payable to [Helmsley–Spear] unless the sale contemplated by a sales agreement which shall have been duly executed during the term of this Agreement, *shall have been consummated in accordance with such sales agreement* and the consideration shall have been paid out. (emphasis added).

Moreover, paragraph 8 of the Agreement grants the Banks the "unqualified right" to reject any proposals for the [Gotham's] purchase *"for any reason whatsoever."* (emphasis added).

In many brokerage situations a broker may be entitled to a commission upon execution of a contract of sale. However, the provision quoted above states clearly that the parties to this action chose a different arrangement. Although in its complaint Helmsley–Spear has asserted that the Banks "impeded the making of a sale contract" and "intentionally delayed the signing of a sale contract," that as a result of the Banks' acts "a sale contract was not and could not be signed within the period set forth in the agreement," and that "[b]ut for defendants' defaults under the agreement as alleged, the Cohen Investment Group was ready, willing and able to sign a sale contract prior to November 23, 1984 on the terms of the written [$45,000,-000] purchase offer submitted November 1, 1984," no sale was ever consummated pursuant to the terms that would have been incorporated in the supposedly delayed contract.

◼ The undisputed facts show that during the term of the Agreement there was an agreement in principal on two offers by the Cohen Group: The November 1, 1984 offer of $45,000,000, all cash, and the February 21, 1985 offer of $45,000,000, payable over twelve years. No sale was ever consummated on the terms of either of those offers, whether or not the terms were incorporated in a contract of sale. Moreover, there is no evidence that the Banks accepted the $40,000,000 offer advanced by the Cohen Group on May 14, 1985, and even if they had, it is again undisputed that no sale was ever consummated pursuant to the terms of this offer. Therefore, the "consummation" requirement of the Agreement has not been met.

◼ Helmsley–Spear urges that its recovery on its contract theory is warranted because performance of the Agreement was frustrated by the acts and non-performance of the Banks, their failure to negotiate in December 1984, their change of policy, their failure to provide tax information and their change in the terms of the Agreement requiring simultaneous closing at the time of contract. It relies on the following language from the Court of Appeals:

The rule is well-established in brokerage cases ... that interference with the opportunity of a broker to complete his services does not bar his right to commissions.... The rule is but a species of a more general doctrine that a promisor is not discharged by the nonperformance of a condition precedent or return promise imposed on the promisee but which the promisor prevented or hindered.

*Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 142, 320 N.Y.S.2d 225, 230, 269 N.E.2d 21 (1971) (citing *Sibbald v. Bethlehem Iron Co.*, 83 N.Y. 378, 383–84 (1881); N.Y. Jur., Brokers, § 128; Restatement, Contracts, § 295) (broker's action against corporation to recover commission for arranging corporate merger which took place two and a half years after he was retained by defendant's predecessor under a written agreement). Helmsley–Spear also relies on *Carnegie v. Abrams*, 37 A.D.2d 327, 325 N.Y.S. 2d 326 (1st Dep't 1971) in which the court held that a seller cannot deprive a broker of its commission by disguising its bad faith and contending that it reached no meeting of the minds with the buyer. These doctrines, which preclude a seller from benefitting from its acts of bad faith, also apply to cases where the seller attempts to avoid paying a commission by taking advantage of time restrictions in a brokerage contract. *Cf. Donald Zucker Co. v. Prime Properties, Inc.*, 392 F.Supp. 933 (S.D.N.Y.1975).

■ The difficulty here is lack of any evidence of bad faith. In view of their monthly payments for the property which approximated $850,000 in lost interest and carrying charges, the Banks' delays, changes of position and nonperformance may well have constituted bad judgment, but there is no evidence of bad faith, that is, "a genuine lack of consensus [between buyer and seller] or a deliberate attempt to escape liability ..." *Carnegie v. Abrams*, 37 A.D.2d 327, 328, 325 N.Y.S.2d 326, 327 (1st Dept.1971). Because the undisputed facts do not establish bad faith on the part of the Banks such as would require a departure from the express terms of the Agreement, this case is closer to *Heller* and *Reiner* than to *Simon* and *Carnegie*.

Therefore, since the conditions precedent to payment of the incentive fee under the Agreement were not met, Helmsley–Spear cannot recover on its claim for a commission.

■ In view of Helmsley–Spear's claim that the Banks frustrated performance, it has been considered whether the Banks may be liable to Helmsley–Spear for wrongful termination of the Agreement. This argument, which has not been fully briefed, rests on the proposition that, by their decision to require a simultaneous contract and closing, which they communicated to Helmsley–Spear in February or March 1985, the Banks unilaterally altered a significant term of the Agreement, virtually foreclosing the possibility of performance of the Agreement. The underlying sale, as finally achieved in June 1986 was a complicated transaction embodied in an 88–page document with 14 attached schedules. It could be argued that to impose such a requirement late in the six month period of the Agreement was to terminate the Agreement for all practical purposes and, therefore, that the Banks' failure to comply with the termination provisions of the Agreement renders them liable to Helmsley–Spear for the cancellation fee provided in paragraph 17 of the Agreement.

However, paragraph 18 of the Agreement expressly provides that the Agreement "may not be changed or modified orally but only by written instrument signed by the parties hereto." There is no evidence in the record that the Banks' intention to require a simultaneous contract and closing was ever reduced to writing or otherwise formally presented to Helmsley–Spear as an essential condition of the sale of the hotel. Indeed, the Banks contend that they began to consider the desirability of a simultaneous contract and closing only after their experience with Cohen counseled them to avoid giving him a sale contract that would be no more than an option. Moreover, even assuming that the Banks' intention in this regard was communicated to Helmsley–Spear prior to the expiration of the Agreement on February 23, 1985, Helmsley–Spear has not established the im-

possibility of meeting that requirement within the additional sixty-day extension period. Therefore, this record does not provide a basis for a finding that the Banks wrongfully terminated the Agreement.

*Fraudulent Inducement*

Helmsley–Spear contends that the Banks defrauded it by concealing knowledge of difficulties relating to the property and misrepresenting certain of those difficulties that were disclosed. Helmsley–Spear has failed to establish the necessary elements of this claim.

A cause of action for fraudulent inducement requires that plaintiff prove: (1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard as to the truth, (4) which was offered to deceive him and induce him to act, and (5) which he relied upon to his injury. *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214 (1969). New York imposes a burden of proof for fraud "far more demanding" than that for breach of contract. *Id.*, 25 N.Y.2d at 121, 302 N.Y.S.2d at 805, 250 N.E.2d 214. Plaintiff must prove each of the elements of fraud by "clear and convincing evidence." *Cave v. Green*, 281 A.D. 560, 562, 120 N.Y.S.2d 865, 867 (1st Dep't 1953), *aff'd*, 308 N.Y. 754, 125 N.E.2d 109 (1955). Where, as here, substantive law compels a heightened evidentiary scrutiny, a court must apply such scrutiny at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513.

According to Helmsley–Spear at the time the Agreement was executed the Banks concealed the existence of a $13,315,000 third leasehold mortgage filed by Banque Worms against the Gotham leasehold. However, the mortgage did not come into existence until January 16, 1985 and was recorded on January 25, 1985. It was, therefore, impossible for the Banks in August and September 1984 to conceal its existence. The Complaint also alleges that at the time the Agreement was executed the Banks concealed "[c]laims by Sol Goldman ... that the leases were in default, and litigation relating thereto filed in or about December 1984 wherein the lessor sought rescission." However, Rogers acknowledged in his deposition that he was told in May or June 1984 about the Goldman default notices that had been received by the Banks. Moreover, the notices of default regarding air rights served in September 1984 by Goldman were promptly withdrawn by his counsel as erroneous. Finally, contrary to Helmsley–Spear's speculation, no notice of default relating to the December 1984 litigation was served before the Agreement was executed.

Helmsley–Spear further contends that the Banks concealed the existence of a $5,000,000 second mortgage held by Flushing Federal. Again, however, Rogers testified that he was told by the Banks of Flushing Federal's $5,000,000 lien as early as Spring 1984, and in a memo to file dated August 13, 1984, Coopchik described a meeting he attended that afternoon at which the Flushing Federal second mortgage was again discussed. In addition, this mortgage was referred to in a letter dated August 27, 1984 to Coopchik.

The complaint also alleges that the Banks concealed the existence of a lawsuit by Hatt to recover the Gotham and that Helmsley–Spear first learned of the "Hatt Lawsuit" on November 5, 1984, when it received a letter from Hatt's counsel. However, during the introductory meetings in Spring 1984, the Banks and DAL advised Helmsley–Spear of the circumstances by which they acquired the Gotham and on June 14, 1984, at the very first meeting between the Banks and Helmsley–Spear after NPAG's buyout period lapsed, the Banks' representatives explicitly stated the probability of a lawsuit by the Gotham's former owners. In October after the Agreement was executed, the Banks' representatives advised Helmsley–Spear further about new litigation, including the Hatt lawsuit which was commenced on August 21, 1984, while the Banks' representatives were back in Germany.

Finally, Helmsley–Spear alleges that the Banks concealed the existence of claims by "contractors, materialmen, artisans and

others...." However, Rogers' notes of meetings with the Banks and DAL record that on June 5, 1984 Helmsley–Spear was told that $6–8 million in mechanics' liens were filed against the Gotham and that on July 19, 1984 Helmsley–Spear was told there were $10–15 million in mechanics' liens, lawsuits and other obligations. Thus, the undisputed facts do not support Helmsley–Spear's claim that the Banks intentionally neglected to disclose facts material to its decision to provide consulting services.

■ Regardless of any factual dispute concerning the adequacy of the Banks' representations, there is no evidence to establish that these representations were intended to deceive Helmsley–Spear. Indeed, the structure of the transaction compels a contrary conclusion. Finally, there is no direct evidence that Helmsley–Spear justifiably relied upon these alleged omissions and misrepresentations in entering into the Agreement. Justifiable reliance is an essential element of an action in fraud. *Petraccione v. Simmons*, 106 A.D.2d 776, 483 N.Y.S.2d 810, 811 (3d Dep't 1984). As experts in the New York City real estate business, Helmsley–Spear's representatives cannot now complain that they failed to realize the significance of the Gotham's problems. The record indicates that from the beginning of its involvement in the Gotham project, Helmsley–Spear was made aware of potential and existing claims against the hotel and that the Banks continued to inform Helmsley–Spear of new problems as they arose. The banks did not have a duty to explain the ramifications of those problems to Helmsley–Spear. Moreover, the record contains no evidence of protest or unwillingness to continue to perform on the part of Helmsley–Spear as it became aware of each of the matters it now alleges were misrepresented. Helmsley–Spear's continued performance under the Agreement after it knew the truth concerning the alleged misrepresentations disproves its claim of reliance and establishes its waiver with respect to this claim. *See Karson v. Arnow*, 32 Misc.2d 499, 224 N.Y. S.2d 891, 898 (S.Ct.N.Y.Co.1962) (right to rescind contract must be exercised promptly after party learns of wrong and acceptance of benefits under contract with knowledge of wrong constitutes waiver of wrong).

*Quantum Meruit and Unjust Enrichment*

■ The Agreement and its extension were completed on April 23, 1985. Thereafter, at the request of Willens, Helmsley–Spear performed services for the Banks. It is entitled to a recovery for the value of those services under the doctrines of quantum meruit and unjust enrichment.

The situation here is similar to that presented in *Mengel v. Lawrence*, 276 A.D. 180, 93 N.Y.S.2d 443 (1st Dep't 1949), where the Court said:

> [T]he plaintiff contends that he is entitled to recover on the theory of performance because of the defendants' arbitrary and capricious termination of negotiations and refusal to proceed, although his buyer was ready, able and willing to close the deal.... Under the circumstances it would seem that the plaintiff might have treated the defendants' conduct as a breach of contract and proceeded on quantum meruit.

*Mengel v. Lawrence*, 93 N.Y.S.2d at 445. Helmsley–Spear also seeks recovery by claiming an implied contract following termination of the Agreement by its own terms.

■ There is no indication in the record that Helmsley–Spear sought or obtained any writing to extend the terms of the Agreement. The April 23, 1985 telex from Boisi to Weiss acknowledged that the Agreement had expired and sought only the payments due. In the absence of bad faith, any frustration of the Agreement by the Banks does not extend it as an implied contract as a matter of law. Under these circumstances, there is no communication, no course of conduct, no principle of law that could create an implied contract as to terms or conditions. Indeed, Helmsley–Spear does not seek under this theory continued monthly payments, in other words a renewal of the original terms of the Agree-

mènt, but simply an implied contract to pay a commission upon the sale of the property. There is no basis for Helmsley–Spear's claim of a contract implied-in-fact regarding the payment of a commission.

■ Moreover, to the extent that Helmsley–Spear's claim of unjust enrichment seeks the commission originally provided for in the Agreement, it is barred by the Agreement which dictated the conditions under which Helmsley–Spear was to be paid for brokerage services and thus precludes recovery of the commission as a matter of law. *See Miller v. Schloss*, 218 N.Y. 400, 406–07, 113 N.E. 337, 339 (1916) (implied contract and quantum meruit recovery barred); *Farm Automation Corp. v. Senter*, 84 A.D.2d 757, 758, 443 N.Y.S.2d 765, 766 (2d Dep't 1981) (unjust enrichment recovery barred).

However, to the extent that the quantum meruit and unjust enrichment claims seek recovery for the services performed outside the Agreement, they are warranted under *Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970), where the Court of Appeals held that judgment would be recovered where the defendant received a benefit from plaintiff's services under circumstances that precluded the defendant from denying an obligation to pay for such services. Although there existed no written contract between the defendant and plaintiff, the defendant obtained the benefit of plaintiff's services and was, therefore, bound to compensate him for such services. As the Court stated: "In sum, given the facts alleged, it would be against good conscience for the defendant to retain the benefits of the contract which the plaintiff made with the defendant's corporation without compensating the plaintiff for the services he fully performed pursuant to the contract." *Bradkin v. Leverton*, 26 N.Y.2d at 199, 309 N.Y.S.2d at 198, 257 N.E.2d at 647.

Here, there is no dispute that following the expiration of the Agreement and its extension, at the Banks' request Helmsley–Spear continued to perform services during April, May, June and July 1985 by attending meetings with the Cohen group, negotiating with prospective purchasers, and reporting to the Banks. Therefore, partial summary judgment will be granted to Helmsley–Spear on its claim for quantum meruit and unjust enrichment. A further hearing is, of course, required to fix the value of such post-Agreement services.

*Conclusion*

The Banks are entitled to the dismissal of Helmsley–Spear's claims for commissions based on the Agreement, fraud or implied contract. Helmsley–Spear is entitled to the value of its post-Agreement services to be determined in a subsequent hearing.

Settle order on notice.

It is so ordered.