**KIDDER PEABODY & COMPANY, INCORPORATED, Plaintiff,**

v.

**UNIGESTION INTERNATIONAL, LTD., Defendant and Third–Party Plaintiff,**

v.

**ASKIN CAPITAL MANAGEMENT, L.P., David Jaffrey Askin, and Dashstar Corporation, Third–Party Defendants.**

**No. 94 Civ. 3241 (RWS).**

United States District Court, S.D. New York.

Sept. 28, 1995.

---

Cleary, Gottlieb, Steen & Hamilton, New York City (Mitchell A. Lowenthal, Luigi L. De Ghenghi, Bernadette Miragliotta, of counsel), for Plaintiff.

Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City (Michael C. Silberberg, Diana D. Parker, Emily Maranjian, of counsel), for Defendant and Third–Party Plaintiff.

Shereff, Friedman, Hoffman & Goodman, New York City (David S. Hoffner, of counsel), for Third–Party Defendants.

## OPINION

SWEET, District Judge.

In this action, the complaint of plaintiff Kidder Peabody & Co., Inc. ("Kidder"), seeks damages for breach of contract, and Defendant Unigestion International, Ltd. ("Unigestion") has counterclaimed for: (i) fraud; and (ii) violations of § 12(2) of the Securities Act of 1933 (the "Securities Act"); (iii) Section 15(c)(3) of the Securities Exchange Act of 1934 (the "Exchange Act") and rule 15c3–3(b)(4)(i) promulgated under the Exchange Act; (iv) Section 15C(b)(7) of the Exchange Act and Regulation 403.4 promulgated under the Exchange Act and has interposed affir-

mative defenses on the grounds that third-party defendants Askin Capital Management, L.P. ("ACM"), David J. Askin ("Askin") and Dashstar Corporation ("Dashstar") were not authorized to transact business with Kidder on Unigestion's behalf and on grounds of fraud. Kidder moves pursuant to Rule 9(b), Fed.R.Civ.P., to dismiss Unigestion's fraud counterclaims and defenses for failure to plead fraud with particularity. Kidder has moved pursuant to Rules 12(c) and 12(f), Fed.R.Civ.P., for judgment on the pleadings with regard to Unigestion's Exchange Act counterclaims and defenses based on lack of authorization.

Unigestion cross-moved for leave to amend its counterclaims. At oral argument of the instant motions on June 21, 1994, Unigestion's Answer was deemed amended, as described further, *infra.*

For the reasons below set out below, Kidder's motion is granted in part and denied part.

### The Parties

Kidder is a Delaware corporation with its principal offices in New York City. Kidder is a broker-dealer registered pursuant to Sections 15 and 15C of the Exchange Act, 15 U.S.C. §§ 78o and 78o–5. Unigestion is a foreign corporation having its principal place of business in Guernsey, Channel Islands, United Kingdom.

### Relevant Non–Parties

ACM is a registered investment adviser. Dashstar is ACM's general partner. Askin is Dashstar's chief executive officer. (ACM, Dashstar and Askin are collectively referred to herein as "Askin/ACM"). Granite Partners L.P. ("Granite Partners"), registered in the State of Delaware, Granite Corporation, incorporated in the Cayman Islands ("Granite Corporation"), and Quartz Hedge Fund ("Quartz"), incorporated in the Cayman Islands, are investment funds established and managed by Askin (collectively, the "Askin Funds"). ACM is the investment adviser of the Askin Funds.

### Prior Proceedings

Kidder commenced this action by filing its Verified Complaint in New York State Supreme Court for New York County on April 14, 1994. The case was removed to the Southern District of New York on May 4, 1994, and assigned to this Court based on its relation to *UBS Securities, Inc. v. Unigestion Int'l, Ltd.,* 94 Civ. 3238; *Arbour Financial Corp. v. Unigestion Int'l, Ltd.,* 94 Civ. 3239; *Lehman Government Securities, Inc. v. Unigestion Int'l, Ltd.,* 94 Civ. 3240; and *Bear Stearns & Co., Inc. v. Unigestion Int'l, Ltd.,* 94 Civ. 4444. Unigestion filed its Answer and Counterclaims on June 17, 1994, and lodged a third-party complaint against ACM, Dashstar, and Askin on June 30, 1994. Kidder filed its Reply to Unigestion's counterclaims on July 21, 1994.

Discovery and discovery-related motion practice was conducted throughout the latter half of 1994 and early 1995. Kidder filed its motion to dismiss Unigestion's counterclaims for failure to plead fraud with particularity and for partial judgment on the pleadings on November 23, 1994. Unigestion filed its motion to amend its counterclaims on January 18, 1995. The parties consented to the rescheduling of these two motions so that they could be argued at the same time. The return date for these motions was subsequently adjourned on consent on three occasions. Oral argument was heard on June 21, 1995, the motions were deemed fully submitted at that time, and Unigestion's Answer, including Counterclaims (hereinafter the "Amended Answer" and the "Amended Counterclaims") was deemed so amended.

### The Factual Allegations [1]

The dispute underlying this action grows out of the collapse, in February and March of

---

1. A motion for judgment on the pleadings is decided in accordance with the same standard associated with a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P; *see* discussion *infra.* In keeping with this standard, the factual allegations in support of Unigestion's counterclaims are presumed to be true, and all factual infer-
ences are drawn in Unigestion's favor. Therefore, the factual allegations set forth here do not constitute findings of fact by the Court. They are drawn from the allegations made by Unigestion in its Amended Answer and Counterclaims and memoranda, affidavits, and other documents submitted in support of its counterclaims.

1994, of the specialized market in collateralized mortgage-backed securities and related derivatives ("CMOs"). Unigestion is a foreign investment corporation. ACM is a registered investment adviser. Askin is its president. Kidder is one of five broker-dealers who were active in the CMO market and with whom ACM entered into contracts and conducted trades on Unigestion's behalf.

### The Askin/Unigestion Relationship

Unigestion contacted ACM/Askin in 1993. During the first half of 1993, Askin and other ACM personnel made verbal and written representations that they were "Mortgage Derivative Security Specialists" and that ACM had developed a "market neutral" investment strategy for investment in various mortgage derivative securities which could be used to protect the value of an investment portfolio against price fluctuations in financial markets. ACM/Askin described this strategy as nonspeculative and involving "little risk." ACM/Askin represented that through the use of its own computer-analytical models and hedging techniques, it could select a portfolio of "bullish" (inversely responsive to interest rates) and "bearish" (directly responsive to interest rates) securities. ACM/Askin represented to Unigestion that such a portfolio could be balanced to create an investment whose performance would be "market neutral". ACM/Askin also represented that they were able to identify "mispriced" securities and to capitalize on this informational advantage. ACM/Askin further represented to Unigestion that the average yearly return from the Askin Funds had been over 15% for at least the previous three years. ACM/Askin compared that annual rate of return with other, lower-yielding investment instruments but did not disclose that the lower-yielding instruments were safer investments. Finally, ACM/Askin represented that the proposed portfolio would contain investments that were limited to terms of one year, thus further reducing the risk associated with interest rate volatility. The portfolio ultimately assembled on behalf of Unigestion had a duration of more than one year and was correspondingly more risky than had been originally represented.

### The Investment Management Agreement

On February 1, 1994, an Investment Management Agreement ("IMA") was executed by ACM and Unigestion, providing that ACM was to be Unigestion's investment advisor with respect to certain funds to be deposited in a custodial account at State Street Bank & Trust Co. ("State Street"). On February 2, 1994, Unigestion opened the custodian account at State Street; number 5450 (the "Account"). Unigestion deposited $10,000,000 in the Account on February 2, 1994, which was to be invested in accordance with the IMA. Under the IMA, Unigestion gave ACM the responsibility of managing the funds in the Account.

The Account was created pursuant to an agreement between Unigestion and State Street (the "Custodian Agreement"). ACM/Askin are not parties to the Custodian Agreement. By the Custodian Agreement, Unigestion employed State Street as custodian of "certain assets of [Unigestion] and assets beneficially owned by certain customers of [Unigestion]" and defined these assets as the "Account". No other meaning or description appeared in the Custodian Agreement concerning the "Account".

The Custodian Agreement also named ACM as "Investment Manager" and required the Custodian to accept any instruction from ACM as if an instruction of Unigestion, so long as such instructions conformed to the provisions of the Custodian Agreement's section of "Proper Instructions". That section set out the acceptable communications media by which instructions might be conveyed and required that such instructions be accepted by State Street only if they came from authorized representatives of ACM or Unigestion. The Custodian Agreement also set out the requirements under which State Street was permitted to pay out account moneys.

Officers of Unigestion signed all documents relating to the opening of the Account. The IMA provided that ACM would invest Unigestion's funds in accordance with the investment strategy that was outlined in the

Investment Guideline (the "Guideline") which was an exhibit to the IMA and was incorporated by reference therein. The Guideline stated that the objective of the investment program that ACM was to undertake for Unigestion was "to generate monthly results largely free of correlation with equity and fixed income market monthly returns." In meetings and in documents described above, ACM represented that this strategy was "market neutral," like that employed for Granite Partners and Granite Corporation—investment vehicles with which Unigestion personnel were familiar.

By its incorporation of the Guideline, the IMA required that Unigestion's portfolio would "be broadly diversified by security type." One family of instruments, inverse floating rate interest only securities ("Inverse IOs"), comprised 56% of the portfolio that ACM assembled for Unigestion. The Guideline contains a non-exclusive list of instruments to be used in assembling the portfolio. Inverse IOs are not mentioned in this list, nor were they mentioned as possible investments for Unigestion's portfolio in the conversations and documents described above. Inverse IOs are riskier and more complicated than the securities listed in the Guideline. It is extremely difficult to predict their performance *vis-à-vis* fluctuations in interest rates.

The IMA also provided that Unigestion's portfolio would be diversified as to the issuing agency of the underlying securities. Ultimately, Federal National Mortgage Associate ("FNMA") was the issuing agency for over 60% of the underlying securities represented in Unigestion's portfolio as invested by ACM.

The IMA required ACM to transmit to Unigestion: (a) *confirmations of account*

transactions; (b) periodic statements received by ACM from State Street and all other account custodians and brokers; and (c) monthly reports on the Account. The monthly reports were to include (i) a portfolio position report, (ii) a statement of the change in the net asset value of the Account, and (iii) a reconciliation of such reports with statements provided by the Custodian and any other financial institutions carrying Account positions.

The IMA also required ACM to obtain Unigestion's approval before allowing the portfolio's debt/equity ratio to exceed 5:1.

The Guideline stated that ACM sought to "control the risks" associated with the investment program, which were nonexclusively listed as: (i) failure to identify and capitalize on the opportunity presented by mispriced securities; (ii) temporary dislocations in the CMO market due to major sentiment swings; and (iii) illiquidity.[2]

The Guideline made no mention of the use of forward contracts or trades. ACM did not disclose to Unigestion the likelihood that ACM would employ forward trading strategies in managing Unigestion's portfolio. The Guideline contained no mention of the risks associated with such strategies.

The IMA contained the following authorization provision in ¶ 5:

> Subject to the limitations, restrictions and objectives set forth in the Investment Guidelines attached hereto as Exhibit A, [Unigestion] hereby grants ACM complete discretion in the investment and reinvestment of the Account (including conversion or exercise of related rights or options with respect to assets in the Account). [Unigestion] authorizes ACM to purchase *and/or sell securities, futures and other*

---

**2.** The Guideline's statement of the risk of illiquidity appears to contain a drafting error. The Guideline reads, in relevant part:

> ACM seeks to maintain an informational advantage through intensive research and modeling to control the risks of the program. Among these risks are that:
>
> 3. Investors *will not* create illiquidity in the market by refusing to trade.

(emphasis added). On its face this provision seems to state that Unigestion's investment was subject to potential negative results if other investors *did not* create illiquidity. The danger, and the eventual actuality, was that investors would render the relevant market illiquid by refusing to trade.

financial instruments for Unigestion's account and to act for [Unigestion] in all matters necessary or incidental to such transactions. As a general matter, ACM may effect transactions with such brokers or dealers as may, in ACM's best judgment, provide prompt and reliable execution of the transactions at favorable prices, including commission rates or dealer markups.

In addition, in ¶ 10, certain notice requirements were imposed on ACM:

ACM will immediately notify [Unigestion] upon the occurrence of any event which would or could be material for the performance of the Agreement by ACM. Such a notification shall in particular be made in the event:

.　　.　　.　　.　　.

(c) ACM determines to set up any customer account or any sub-account to facilitate management of the Account.

During the negotiation of the IMA, ACM provided a form investment management agreement to Unigestion, which Unigestion modified to include the above-quoted notice provision. Unigestion also negotiated for the inclusion of the IMA's requirement that ACM immediately notify Unigestion in the event that the Account was devalued by 25%. The IMA contained no express provision that specifically authorized ACM to open securities accounts with securities broker-dealer firms such as Kidder. Nor did the IMA give to ACM any power of attorney or other express authority that specifically empowered ACM to execute contracts on Unigestion's behalf.

Other than the reference in ¶ 5 to the Guideline, the IMA contains no other express, specific limitation on the ACM's authorization "to act for [Unigestion] in all matters necessary or incidental to such transactions."

### The Opening of Unigestion's Kidder Account

Commencing February 1994, ACM/Askin opened an account with Kidder in the name of Unigestion ("Unigestion's Kidder Account"). ACM/Askin did not notify Uniges-

tion that it had done so, and Unigestion personnel did not learn of the existence of the account until after March 30, 1994.

At the time that this account was opened, accounts were also maintained by ACM at Kidder in the names of Granite Partners, Granite Corporation, Quartz, and other segregated accounts managed by ACM/Askin. Those accounts were highly leveraged at that time and had been having financial difficulties before February 1994, because an increase in interest rates which had begun in the United States in December 1993, had caused a decline in bond prices. That decline had triggered a deterioration of the portfolios of Granite Corporation, Granite Partners, Quartz, and the other segregated accounts managed by ACM/Askin because of the illiquid, volatile, and bullish securities they held.

Neither ACM/Askin nor Kidder ever sent Unigestion any documents to execute concerning Unigestion's Kidder Account. Kidder documents indicate that Kidder never obtained certain documents required for the opening of such an account, including, corporate resolutions of Unigestion approving trading authority.

Kidder never sent written confirmations of the securities transactions (described below) or account statements to Unigestion or to State Street as custodian.

### The Transactions

Subsequent to the execution of the IMA, in February and March of 1994, ACM conducted various transactions with Kidder on Unigestion's behalf. These transactions included (i) purchases and sales of CMOs and (ii) leveraged transactions called "repos", in which a buyer purchases securities from the seller with an agreement to resell the same securities back to the buyer at a fixed price at a later date.

The CMO investments which Askin made on Unigestion's behalf were neither nonspeculative nor of limited risk. The type of CMOs in which ACM/Askin chose to invest Unigestion's funds were high-risk securities, as compared to many common stocks, mutual funds or other derivatives. Moreover, these

securities were so complicated that predicting their price sensitivity *vis-à-vis* fluctuating interest rates was extremely difficult, even for ACM/Askin, who had represented themselves as specialists in the CMO field. ACM/Askin did not disclose this difficulty to Unigestion.

Beginning in February, active bidding decreased in the market for mortgage derivative securities. Beginning in March, spreads widened in the mortgage pass through market and exacerbated the problem. Because the Askin Funds' investments were leveraged, brokerage firms at which ACM/Askin had established accounts began making margin calls. To meet the margin calls, ACM/Askin was forced to sell securities into a market which was rapidly becoming illiquid and in which fewer and fewer participants were placing bids. Lack of cash and pressure to meet margin calls prevented ACM/Askin from following its hedged "market neutral" strategy with respect to the Askin Funds and other Askin managed accounts.

Unigestion's account did not lack cash. Nevertheless, ACM/Askin purchased, financed, and sold securities for Unigestion's account—purportedly—in the same manner that it purchased, financed and sold securities for the Askin Funds and other Askin managed accounts.

ACM/Askin had to sell securities to raise cash needed by the Askin Funds and other Askin managed accounts, not including Unigestion, and the only securities that were saleable were bearish securities: those that were increasing in value as interest rates rose. To entice Kidder to purchase the Askin Funds' securities and securities of other Askin managed accounts, ACM/Askin purchased other securities for forward settlement (which required no cash payment until March 30 or later) for the Askin Funds and other Askin managed funds, including purchases made on behalf of Unigestion.

Securities purchased by ACM/Askin were high-margin securities, which were very profitable for brokers such as Kidder. Competition to underwrite CMOs was highly intense during the period in question, and ACM/Askin's business was heavily sought after. Kidder was the largest underwriter of CMOs, and Kidder was the broker with whom ACM/Askin did the most business during the period in question.

In other words, it is alleged that ACM/Askin, with the participation of Kidder, used the funds deposited by Unigestion with State Street for the purpose of effectuating trades with Kidder, in order to benefit Granite Corporation, Granite Partners, Quartz, and Askin (as a shareholder of Granite Corporation and Quartz, as General Partner of Granite Partners, and as investment advisor of those entities), as well as Kidder as broker. Neither ACM/Askin nor Kidder informed Unigestion that these purchase transactions were executed in Unigestion's name for the actual purpose of easing the way for otherwise problematic sales of securities held by the Askin Funds, for the mutual benefit of ACM/Askin and Kidder, at the expense of Unigestion. Kidder knew that Granite Corporation and Granite Partners needed cash, and in exchange for Kidder's purchase of securities from those entities, Kidder looked to ACM to purchase high-risk and potentially illiquid securities, for forward settlement, from Kidder.

During the week of January 28, 1994, Kidder underwrote $1,819,809,621 of FNMA Series 1994-33 ("FN 94-33"). High risk securities were to be included in FN 94-33, and Kidder desired to sell as many of these high-risk securities as possible. Kidder designed and created FN 94-33 Class S ("FN 94-33S"), an Inverse IO, as the most high-risk and potentially most difficult to sell class of FN 94-33. On February 1, 1994, Kidder sold the entire FN 94-33 Class S issue—$368,634,669 worth—to ACM at a price subject to modification based on a yield maintenance formula for settlement on March 30, 1994. In exchange, Kidder purchased from the Askin Funds $9.3 million of FN 93 75 S, $1.4 million of FN 91 G15SA, and $900,000 of FN 91 G26S (the "First Swap Securities") with total proceeds to the Askin Funds of over $20 million for settlement on February 8, 1994. The purchase by ACM of FN 94-33S was executed at a manipulated price as

an inducement for Kidder to purchase the first swap securities from the Askin Funds.

On February 1, Unigestion had not opened the State Street account and, therefore, had not, in the language of the IMA "place[d] under the management of ACM" any securities or cash. ACM, therefore, could not have traded on Unigestion's behalf on February 1, because there was were as yet no assets with which to trade. On February 4, despite the fact that Unigestion had not owned any of the first swap securities, a purchase of $8,634,669 worth of the high risk FN 94–33 Class S was processed for Unigestion's Kidder Account with a trade date of February 1 (the "February 1 Trade"). No trade ticket for this purported transaction with Unigestion's Kidder Account has been produced by Kidder. A Kidder Investor Account statement, in the form used for individual and institutional customers of Kidder, for the period February 1 to February 28, 1994 ("Unigestion's Kidder Account February Statement"), does not list the purchase of FN 94–33 Class S as a transaction for Unigestion's Kidder Account during February 1994, nor does it list FN 94–33 Class S as an open position of Unigestion's Kidder Account as of February 28, 1994. The trade confirmation of this transaction indicates that the date of the trade as "2/1/94".

An almost identical pair of transactions was executed with a trading date of February 2, 1994, involving another high-risk and potentially difficult to sell class of derivative instruments, derived from mortgage-backed securities issued by Federal Home Loan Mortgage Corporation ("FHLMC") and identified as FH 1695 Class RJ. On March 21, despite the fact that Unigestion did not own any of the securities which Kidder purchased in exchange for ACM's purchase of the FH 1695 Class RJ (the "Second Swap Securities") $6,000,000 of FH 1695 DJ was processed for Unigestion's Kidder Account with a trade date of February 2, 1994. As in the first transaction, no trade ticket was produced documenting this transaction. The February statement for Unigestion's Kidder Account does not list the purchase of FH 1695 DJ as a transaction for Unigestion's

Kidder Account during February 1994, nor does it list FH 1695 DJ as an open position of Unigestion's Kidder Account as of February 28, 1994.

On February 11, 1994, Kidder sold ACM another series of FNMA securities, $1,000,-000 of which was attributed to Unigestion's Kidder Account. As with the previous trades, no trade ticket or other account documents indicate that the transaction actually was executed for Unigestion on the trade date.

Kidder documents show a reverse repurchase/repurchase transaction ("repo") for $1,000,000 of FN 89 75G for Unigestion's Kidder Account on February 18, 1994. Repo transactions executed by brokers and dealers for the account of customers are subject to Exchange Act Rule 15c3–3(b)(4)(i), 17 C.F.R. § 240.15c–3(b)(4)(i), and 17 C.F.R. § 403.4. This Rule provides that a broker or dealer that retains custody of securities that are the subject of a repo transaction shall obtain a repurchase agreement in writing. No such agreement was executed by Unigestion or ACM regarding the February 18 repo transaction, which resulted in a loss of $122,129 by Unigestion which has not been recovered.

Twelve more transactions are detailed in the Amended Counterclaims. These subsequent transactions, like the three described above, lacked trade tickets indicating that, as of the trade date, the transaction was being executed for the account of Unigestion. They all involved highly speculative investments. Some were "repos", others were "IOs". Some involved a "swap security" scenario as described above, in which ACM, for the benefit of the cash-poor Askin Funds bought highly speculative, hard-to-sell CMO securities from Kidder in exchange for Kidder's buying securities from the Askin Funds, thereby providing needed cash to the Askin Funds. ACM then attributed hundreds of thousands of dollars of the newly purchased, high-risk CMO derivatives to Unigestion's Kidder Account. The table below sets out the key details of the transactions already described and subsequent transactions.

| Trade Date | Date Processed | Kidder Series Designation | Transaction Type | Total Amount of Sale to Askin | Price of Portion Attributed to Unigestion | Trade Ticket Attributing Sale to Unigestion as of Trade Date? (Y/N) | Was "Swap Security" Involved? (Y/N) |
|---|---|---|---|---|---|---|---|
| 2/1/94 | 2/4/94 | FN 94 33S | Inverse IO | $368,634,669 | $ 8,634,669 | No | Yes |
| 2/2/94 | 3/21/94 | FH 1695RJ | Inverse IO | $300,000,000 | $ 6,000,000 | No | Yes |
| 2/11/94 | 2/16/94 | FN 147PN | "IOette" | $152,495,000 | $ 1,000,000 | No | No |
| 2/18/94 | 2/24/94 | FN 92 G67S | Inverse IO | $153,500,000 | $12,500,000 | No | Yes |
| 2/18/94 | 2/23/94 | FH 1344S | Inverse IO | $257,727,840 | $17,727,844 | No | Yes |
| 2/23/94 | 2/23/94 | FN 92 26S | Inverse IO | $ 875,000 | $ 77,000 | No | Yes |
| 2/24/94 | 2/28/94 | FN 92 139SA | Inverse IO | $ 2,400,000 | $ 120,000 | No | Yes |
| 2/24/94 | 3/21/94 | FH 1695D | Inverse IO | $100,000,000 | $ 7,250,000 | No | Yes |
| 3/4/94 | 3/10/94 | FH 1710AK | Inverse IO | $300,000,000 | $ 5,000,000 | No | No |
| 3/10/94 | 3/14/94 | FH 1534L | Inverse IO | $220,000,000 | $ 5,250,000 | No | Yes |
| 3/25/94 | unknown [3] | FH G031S | Inverse IO | $ 35,000,000 | unknown [4] | No | Yes |

With regard to FH 1710AK, listed above, Kidder made affirmative written representations that this derivative security was "bearish" (i.e., its price would rise if interest rates rose). FH 1710AK was, in fact, of the type of derivative security discussed above, whose sensitivity to fluctuating interest rates was extremely difficult to predict.

During February and March of 1994, several other repo transactions were executed for Unigestion's Kidder Account, following roughly the same scenario described above with regard to FN 89 75G, all of which resulted in unrecovered losses for Unigestion.

On February 23, 1994, Askin signed a PSA Master Repurchase Agreement ("PSA Agreement") purportedly as Unigestion's "Authorized Representative". Prior to Feb-

3. The date that this transaction was processed is not known since Kidder has not produced a trade confirmation for the transaction and it does not appear on any account statement.

4. Neither the Proposed Amended Complaint nor any of Kidder's submissions indicates the portion of this transaction which was allocated to Unigestion. Kidder's asserted claim growing out this transaction is $337,500.

ruary 23, 1994, no account document at Kidder was signed by ACM or Unigestion.

At least one repo transaction was inaccurately recorded in Kidder's records. A Kidder trade ticket shows that a purchase for Unigestion's Kidder Account of FN 92 139SA was to be settled on March 30, 1994. However, Kidder documents other than the trade ticket indicate that this transaction was actually settled on March 3, 1994. This transaction resulted in a loss to Unigestion of $72,674.

### Alleged Market Manipulation

In February and March of 1994, it was important to ACM/Askin and to Kidder to maintain the price of the securities issued by Kidder and purchased and sold by ACM/Askin. It was also important to ACM/Askin and Kidder to continue make trades in an increasingly illiquid market. ACM/Askin needed to maintain the value of the portfolios of Granite Corporation and Quartz, of which Askin was a shareholder, and Granite Partners, of which Askin was a general partner and from which ACM/Askin received substantial management fees.

By March 16, 1994, at the latest, Kidder knew that the financial health of the Askin Funds had deteriorated significantly. The sales made by Kidder to ACM for Unigestion were at substantial price mark-ups. Although there was a business strategy behind these mark-ups that was mutually beneficial for Kidder and ACM/Askin, Unigestion was never informed of the practice. Further, as mentioned above, the swap scenario was a way for Askin to alleviate the cash needs of the Askin Funds. Since Unigestion was not similarly strapped for cash, the swap scenario held no corresponding benefit for Unigestion.

### ACM's Account Statements and Other Representations to Unigestion

On March 18, 1994, Unigestion received its first statement from ACM/Askin. That statement showed that the Account at State Street had increased 2.44% in value—a gain of $244,240—as of February 28, 1994. This statement omitted to state that accounts had been opened at brokerage firms. Several of the mark-to-market prices reported on the statement which were attributed to various brokers were actually marks by Askin and differed from the values submitted by the brokers to ACM/Askin on or about February 28, 1994. ACM/Askin never informed Unigestion that the mark-to-market prices on the February statement were ACM/Askin's and not those of the brokers. Due to this discrepancy, the actual value of Unigestion's portfolio was lower than that reflected in the February 28 statement.

On March 15, 1994, margin calls were made on accounts managed by ACM/Askin. On March 23, 1994, additional margin calls were made on those accounts. On March 25, 1994, ACM/Askin reportedly informed investors for the first time that Granite Partners' portfolio was down 21.8% in February, rather than the 1.5% previously estimated. On March 28, 1994, Unigestion was advised for the first time that the portfolio value of the Askin Funds had significantly deteriorated. Askin told Unigestion by telephone that as a consequence of "errors" in the evaluation of the underlying securities, the performance of Granite Partners and Granite Corporation as of February 28, 1994, had to be substantially revised downward, to minus 22%, and that the Askin Funds had received numerous margin calls totalling $45,000,000, payable on March 30, which the funds were not able to meet.

During these discussions, Askin represented to Unigestion that the problems did not concern the Account of Unigestion at State Street, which was, according to Askin, "untouched."

### Kidder's Representations

FN 94 33S, FH 1695D, FH 1710AK and FH G031S were all purchased at prices subject to downward revision based on yield maintenance formulas. Prior to and during the period in question, the purchase prices of the securities in question were not modified downward, thus creating the impression that the securities were worth more than they really were. Kidder represented to ACM/Askin that it was a market maker in the CMOs described above. This representation was made to ACM/Askin, who acted as Unigestion's agent.

Kidder also represented that the Inverse IOs it offered to ACM/Askin were bearish, which characterization Kidder knew was critical to ACM/Askin's investment strategy. For example, ACM based its decision to pur-

chase FH 1710AK on, among other things, Kidder's written representation described above that FH 1710AK was "bearish". As discussed above, FH 1710AK was, in fact, an instrument whose derivation was so complex and which traded in such a small market that a prediction of its sensitivity to interest rate fluctuations was extremely difficult, if not impossible.

Kidder provided mark-to-market prices on a regular basis to ACM/Askin. Prior to late March, 1994, these prices did not deviate significantly from the agreed-upon purchase prices of the securities in question. In late March, Kidder revised the mark-to-market prices on the securities sharply downward. These price changes were in excess of a price change that could reasonably be explained by changes in the bond market or interest rates during this relatively brief time period. The lower mark-to-market prices precipitated margin calls on accounts managed by ACM/Askin, including Unigestion's Kidder Account.

### Liquidations

Based on its discussions with ACM/Askin on March 28, 1994, regarding the deterioration in portfolio value of the Askin Funds and the $45,000,000 in margin calls on those funds, Unigestion concluded that ACM/Askin was no longer in a position to act as its Investment Manager. By fax dated March 29, 1994, Unigestion instructed ACM to proceed with the immediate liquidation of all positions in the Account with State Street and restricted ACM's trading authorization accordingly. Simultaneously, on March 29, 1994, Unigestion instructed State Street to transfer to it any available funds. On March 29, 1994, State Street was not aware of any forward trade commitments on behalf of Unigestion to Kidder or to any other broker.

On March 31, 1994, ACM wrote a letter to Kidder advising it that any inquiry concerning Unigestion should be addressed to Unigestion's American counsel, Newman Tannenbaum Helpern Syracuse & Hirschtritt ("Newman Tannenbaum"). Also on March 31, 1994, Kidder sent a letter to Newman Tannenbaum informing them of a margin call on Unigestion's Kidder Account. Prior to this letter Unigestion had not received any communication from Kidder and did not know of the existence Unigestion's Kidder Account. Through Newman Tannenbaum, Unigestion, by letter and fax dated March 31, 1994, explained to Kidder that Unigestion had "no knowledge of an account with [Kidder]."

By letter and fax dated April 6, 1994, Unigestion again asserted to Kidder that the transactions were not authorized and requested a copy of all documents pertaining to the account opened in its name.

Inasmuch as ACM/Askin had had outstanding margin calls with several brokers in the comparatively small CMO market, ACM/Askin found itself in the bind of needing to sell to one broker a certain security which was held by another broker who would not release the security for sale because of an outstanding margin call against ACM. As Kidder and other brokers sought to liquidate securities of Askin's which they held as collateral for repo transactions, a "fire sale" ensued in which Kidder, in order to satisfy Askin's outstanding margin debts, sold some securities which had been purchased for Unigestion's Kidder Account.

### Bankruptcy of ACM Managed Entities

ACM, Granite Corporation, Granite Partners and Quartz failed to meet all margin calls received in March. Granite Corporation, Granite Partners and Quartz filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on April 7, 1994.

### Discussion

### The Counterclaims

The following Amended Counterclaims are at issue in this motion:

1. *Conversion:* ACM/Askin's unauthorized use of Unigestion's funds in connection with Unigestion's Kidder Account constituted conversion of Unigestion's property by ACM/Askin, aided and abetted by Kidder.

2. *Securities Fraud in Violation of Section 10(b) and Rule 10b–5:* Unigestion alleges, as an alternative to its First Amended Counterclaim, that as described above, Kidder committed securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.

3. *Conspiracy by Kidder and ACM/Askin to Violate 10(b) and Rule 10b–5:* Uniges-

tion alleges that Kidder conspired with ACM/Askin to commit securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.

4. *Failure to Notify in Violation of Rule 10b–10:* Unigestion alleges that Kidder did not notify Unigestion that securities transactions had been made for its account, or gave late or false or misleading notification of such transactions, as described above, in violation of Section 10(b) of the Exchange Act and Rule 10b–10 promulgated thereunder ("Rule 10b–10").

5. *Conspiracy to Violate Rule 10b–10:* Unigestion alleges that Kidder conspired with ACM/Askin in not notifying Unigestion of securities transactions, or conspired to give late or false or misleading notification, in violation of § 10(b) of the Exchange Act and Rule 10b–10.

6. *Failure to Disclose Account Credit Terms in Violation of Rule 10b–16:* Unigestion alleges that, in connection with the opening and maintenance of Unigestion's Kidder Account, Kidder did not disclose the credit terms of Unigestion's Kidder Account in violation of § 10(b) of the Exchange Act and Rule 10b–16 promulgated thereunder ("Rule 10b–16").

7. *Conspiracy to Violate Rule 10b–16:* Unigestion alleges that, in connection with the opening and maintenance of Unigestion's Kidder Account, Kidder conspired with ACM/Askin in not disclosing the credit terms of Unigestion's Kidder Account notifying Unigestion of securities transactions, or conspired to give late or false or misleading notification, in violation of § 10(b) of the Exchange Act and Rule 10b–16 promulgated thereunder.

8. *Repurchase Transactions in Violation of § 15(c)(3) of the Exchange Act:* Unigestion alleges that Kidder retained custody of securities that were the subject of repurchase agreements between Kidder and Unigestion without complying with the requirements of Section 15(c)(3) of the Exchange Act and Rule 15c3–3(b)(4)(i) promulgated thereunder, concerning the execution of written repurchase agreements and written confirmations stating the specific securities that were the subject of each repurchase transaction.

9. *Conspiracy Involving Repurchase Transactions in Violation of § 15(c)(3) of the Exchange Act:* Unigestion alleges that Kidder conspired with ACM/Askin to retain custody of securities that were the subject of a repurchase agreements between Kidder and Unigestion without complying with the requirements of Section 15(c)(3) of the Exchange Act and Rule 15c3–3(b)(4)(i), promulgated thereunder, concerning the execution of written repurchase agreements and written confirmations stating the specific securities that were the subject of each repurchase transaction.

10. *Conspiracy Involving Repurchase Transactions in Violation of Section 15C(b)(7) of the Exchange Act and Regulation 403.4:* Unigestion alleges that Kidder conspired with ACM/Askin to retain custody of securities that were the subject of repurchase agreements between Kidder and Unigestion without complying with the requirements of Section 15C(b)(7) of the Exchange Act and Regulation 403.4 promulgated thereunder, concerning the execution of written repurchase agreements and written confirmations stating the specific securities that were the subject of each repurchase transaction.

11. *Material Misrepresentations and Omissions in Violation of § 12(2) of the Securities Act:* Unigestion alleges that Kidder made material misrepresentations and omissions, as described above, in violation of Section 12(2) of the Securities Act.

12. *Conspiracy to Violate § 12(2) of the Securities Act:* Unigestion alleges that Kidder conspired with ACM/Askin to make the misrepresentations and omissions described above, in violation of Section 12(2) of the Securities Act.

13. *Voidable Contracts § 29(b) of the Exchange Act:* Unigestion alleges that Kidder defrauded Unigestion's agent, ACM, in inducing ACM to enter into certain contracts obligating Unigestion to purchase certain securities from Kidder, rendering those contracts voidable at the option of Unigestion, the deceived party, pursuant to § 29(b) of the Exchange Act.

14. *Common Law Fraud:* Unigestion alleges, that Kidder's actions, described above, constitute common law fraud.

15. *Breach of Fiduciary Duty:* Unigestion alleges that ACM/Askin owed a fiduciary duty to Unigestion, that ACM/Askin breached that duty, and that Kidder participated in such breach.

16. *Negligence:* Unigestion alleges that Kidder negligently represented to Unigestion that the securities purportedly sold to Unigestion were "bearish," negligently priced those securities, and negligently failed to send confirmations to Unigestion or anyone acting on its behalf.

In its Amended Answer, Unigestion has also raised numerous affirmative defenses, the Second, Third, Fourth, Fifth, and Sixth of which are based upon the assertion that ACM/Askin was not authorized to conduct business with Kidder on Unigestion's behalf. Kidder moves for judgment on the pleadings as to these affirmative defenses as well.

### Legal Standards

#### A. *Rule 12(c)*

The standard for determining whether to grant a motion for judgment on the pleadings under Rule 12(c), Fed.R.Civ.P., is the same as that governing a motion to dismiss made under Rule 12(b)(6). *George C. Frey Ready–Mixed Concrete Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 553 (2d Cir.1977). In deciding the merits of the motion, all material allegations composing the factual predicate of the claims dismissal of which is sought are taken as true, for the court's task is to "assess the legal feasibility of the [complaint or counterclaim], not assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774 (2d Cir.1984). Thus, unless it is beyond doubt that the claimant (here Unigestion) can prove no set of facts in support of its claim which would warrant relief, the motion for judgment on the pleadings must be denied. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 250, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

#### B. *Rule 12(b)(6)*

Inasmuch as a motion to dismiss under Rule 12(c) is reviewed under the standard for a Rule 12(b)(6) motion to dismiss, those standards are briefly reviewed. The factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations set forth and considered herein are taken from the Amended Counterclaim and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion to dismiss.

#### C. *Rule 9(b)*

Rule 9(b), Fed.R.Civ.P., requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 265 (2d Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971). The pleading must be sufficiently particular to serve the three goals of Rule 9(b) which are (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd sub nom. O'Brien v. Nat'l Property Analysts Partners,* 936 F.2d 674 (2d Cir.1991).

The Court of Appeals has required that allegations of fraud adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of

the person who made them. *See McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir. 1992); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Finally, the Court of Appeals has held that a complaint charging fraud must assert that defendant possessed an intent to defraud or, at minimum, allege circumstances from which an inference of such intent could be drawn. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds by United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989).

■ The pleading must give notice to each opposing party of its alleged misconduct. To this end, the counterclaim may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged. *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 n. 7 (S.D.N.Y.1977). This requirement facilitates the preparation of an adequate defense while protecting a party's reputation from groundless accusations. *See de Atucha v. Hunt,* 128 F.R.D. 187, 189 (S.D.N.Y.1989), *aff'd sub nom. de Atucha v. Commodity Exchange,* 979 F.2d 846 (2d Cir.1992); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir. 1982). It also serves to prevent the abuse of process and the gratuitous disruption of the normal business activity. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975).

■ Inasmuch as Unigestion's Fourteenth Counterclaim sounds in common law fraud, it should be noted that there are five elements necessary to sustain a claim in fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Dep't Stores Co. v. International Leasing Corp.,* 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987); *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969).

These standards are applied here, as required by Kidder's motion, to Unigestion's counterclaims and defenses.

### *Neither Section 15(c)(3) Nor Section 15C(b)(7) Provides a Private Right of Action*

■ Unigestion's Eighth and Ninth Counterclaims allege violations of § 15(c)(3) of the Exchange Act, while Unigestion's Tenth Counterclaim alleges violations of § 15C(b)(7) of the Exchange Act. Kidder moves for judgement on the pleadings as to these Counterclaims on the ground that no private right of action is conferred by these statutory sections. No authority binding on this Court has yet resolved this question.

In addressing the existence of a private right of action under another section of the Exchange Act, the Supreme Court directed that "the central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); *see also Asch v. Philips, Appel & Walden, Inc.,* 867 F.2d 776, 777 (2d Cir.) *cert. denied,* 493 U.S. 835, 110 S.Ct. 114, 107 L.Ed.2d 75 (1989). Analysis of Congress' intent begins with the language of the statute itself, then proceeds if necessary to the legislative history of the enactment. *Touche Ross,* 442 U.S. at 570–72, 99 S.Ct. at 2486–87; *see Cort v. Ash,* 422 U.S. 66, 79, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). Legislative intent may also be inferred from examination of the statutory scheme of which the provision in question is part. *Touche Ross,* 442 U.S. at 571–73, 99 S.Ct. at 2486–88.

Congress' language in § 15(c)(3) states the broad and simple mandate that brokers and dealers must comply with rules promulgated pursuant to § 15 of the Exchange Act:

(3) No broker or dealer (other than a government securities broker or government securities dealer, except a registered broker or dealer) shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other

than an exempted security (except a government security) or commercial paper, bankers' acceptances, or commercial bills) in contravention of such rules and regulations as the Commission shall prescribe as necessary or appropriate in the public interest or for the protection of investors to provide safeguards with respect to the financial responsibility and related practices of brokers and dealers including, but not limited to, the acceptance of custody and use of customers' securities and the carrying and use of customers' deposits or credit balances. Such rules and regulations shall (A) require the maintenance of reserves with respect to customers' deposits or credit balances, and (B) no later than September 1, 1975, establish minimum financial responsibility requirements for all brokers and dealers.

15 U.S.C. § 78o(c)(3). The primary aim expressed in these words is that of protecting the integrity of the securities markets through regulatory compliance. The protection that § 15(c)(3) affords to private parties is a positive but incidental by-product of the primary goal. *See Corbey v. Grace* 605 F.Supp. 247, 250 (D.Minn.1985); *Pierson v. Dean, Witter, Reynolds, Inc.,* 551 F.Supp. 497, 503 (C.D.Ill.1982).

Rule 15c3–3(b)(4) sets out specific procedural rules governing the conduct of a broker or dealer that retains custody of securities that are subject to a repurchase agreement between itself and a counterparty. It requires, *inter alia,* that the broker obtain a written repurchase agreement and give written confirmation as to the specific securities that are the subject of a repurchase transaction at the end of the trading day on which the repurchase transaction is executed. *See* 17 C.F.R. § 240.15c3–3(b)(4).

Regulation 403.4 updates and adds detail to the requirements of Rule 15c3–3. *See* 17 C.F.R. Pt. 403.4.

Unigestion correctly points out that the regulations in question, which were promulgated under § 15(c)(3), regulate the conduct of broker/dealers toward private trading parties. *See* Rule 15c3–3(b)(4); Regulation 403.4. Unigestion seeks to analogize this agency-made provision to § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. However, the Supreme Court has acknowledged that § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), demonstrated Congress' intent to create a private right of action. *See Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 & n. 9, 92 S.Ct. 165, 169 & n. 9, 30 L.Ed.2d 128 (1971) (citing *J.I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)). The language of the corresponding rule was not essential to the analysis used in *Bankers Life* or *J.I. Case.* Rule 10b–5 serves only to add further detail to a prohibition of conduct already described in the statute. In distinction, the language of § 15(c)(3) brings only a defined class of market actors—broker/dealers—under the regulatory purview of the Securities and Exchange Commission ("SEC") and authorizes the SEC to "provide safeguards with respect to the financial responsibility and related practices of brokers and dealers." The highly detailed articulation of the corresponding rules, whose provisions are specifically related to Unigestion's counterclaim, cannot, without more in the statute itself, be read to indicate an implied right of action. *See* Rule 15c3–3(b)(4). As was noted in this Court some years ago: "Generally ... the question of private remedies focuses on a particular statute rather than a rule promulgated pursuant to a statute." *Slomiak v. Bear Stearns & Co.,* 597 F.Supp. 676, 680 (S.D.N.Y.1984).

Unigestion's reference to civil rights cases is inapt for the same reason. In those cases the Supreme Court found the language which evinced Congress' intent in the statutes themselves. *See Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 238–40, 90 S.Ct. 400, 405–06, 24 L.Ed.2d 386 (1969). No agency-made rules or regulations were at issue in those cases; thus, they provide no support for Unigestion's argument, which is based on detailed regulatory requirements.

Section 15C(b)(7) simply extends the standard anti-fraud protection of § 15(c)(1) to include government securities. As has been observed with regard to § 15(c)(1), if the legislative scheme of the Exchange Act is considered as a coherent whole, a private right of action specifically for those wronged by a violation of 15(c)(1) (and by extension 15C(b)(7)) would be redundant, to a signifi-

cant extent, with the private right of action afforded by § 10(b). *See Prestera v. Shearson Lehman Bros., Inc.,* 86 Civ. 1528, 1986 WL 10095, at *3 (D.Mass., July 30, 1986).

Further with regard to § 15(c)(1), our Court of Appeals has held that its broadly stated anti-fraud prohibition affords no private right of action. *See Asch,* 867 F.2d at 777. One case from within this District and a related line of persuasive authority maintains that § 15 *read as a whole* does not afford a private right of action. *See Baum v. Phillips, Appel & Walden, Inc.,* 648 F.Supp. 1518, 1529 (S.D.N.Y.1986); *see also Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1313–14 (9th Cir.1982). *Shotto v. Laub,* 632 F.Supp. 516, 518 (D.Md.1986); *Olsen v. Paine Webber, Jackson & Curtis, Inc.,* 623 F.Supp. 17, 18 (M.D.Fla.1985); *see also Berner v. Lazzaro,* 730 F.2d 1319, 1320 n. 1 (9th Cir.1984), *aff'd sub nom. Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985).

Finally, in other jurisdictions, a number of courts have specifically addressed sub-paragraph (c)(3) and have found that no private right of action is afforded therein. *See Carapico v. Philadelphia Stock Exch.,* 93 Civ. 3066, 1994 WL 50295, at *2 (E.D.Pa. Feb. 14, 1994); *aff'd* 43 F.3d 1460 (3d Cir.1994); *Bull v. American Bank & Trust Co. of Pa.,* 641 F.Supp. 62 (E.D.Pa.1986) *Walck v. American Stock Exchange,* 565 F.Supp. 1051, 1059 (E.D.Pa.1981), *aff'd,* 687 F.2d 778 (3d Cir. 1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *Pierson,* 551 F.Supp. at 502–03.

For these reasons, Kidder's motion for judgment on the pleadings as to Unigestion's Eighth, Ninth, and Tenth Amended Counterclaims will be granted.

### Securities Issued by Instrumentalities of the U.S. Government

Kidder contends that Unigestion's Eleventh and Twelfth Counterclaims, which allege violations of § 12(2) of the Securities Act, should be dismissed on the grounds that the securities which are traded in the transactions about which Unigestion complains are exempt securities for purposes of application of laws administered by the SEC. *See* 12 U.S.C. § 1719(d) (FNMA); 12 U.S.C. 1455(g) (FHLMC). Preliminarily, Unigestion concedes that the securities in question were issued by, respectively, FNMA and FHLMC.

Section 3(a)(2) of the Securities Act exempts from the Act's registration requirements, *inter alia,* any "security issued or guaranteed by the United States or any territory thereof, ... or by any person controlled or supervised by and acting as an instrumentality of the Government of the United States pursuant to authority granted by the Congress of the United States." 15 U.S.C. § 77c(a)(2). Section 12(2) of the Securities Act exempts a far narrower category of securities from its ambit, imposing liability even where securities exempt from registration are concerned. In an exception to this exception, however, § 12(2) does not impose liability where the underlying securities involved are those indicated in § 3(a)(2)—government securities. 15 U.S.C. § 77l.

At issue, then, is whether or not the securities at issue here—FNMA and FHLMC mortgage-backed securities—are government securities. Title 12 U.S.C., which governs instruments issued by FNMA and FHLMC, speaks directly to this point. Section 1719(d) of Title 12 states that "Securities issued by [FNMA] ... shall, to the same extent as securities which are direct obligations of or obligations guaranteed as to principal and interest by the United States, be deemed to be exempt securities within the meaning of laws administered by the Securities and Exchange Commission." Similarly, "[a]ll securities issued or guaranteed by [FHLMC] ... shall, to the same extent as securities that are direct obligations of or obligations guaranteed as to principal or interest by the United States, be deemed to be exempt securities within the meaning of the laws administered by the Securities and Exchange Commission." 12 U.S.C. § 1455(g).

Unigestion argues that the securities at issue are not government securities, contending that FNMA and FHLMC are government-sponsored private corporations. Unigestion cites the face of the prospectus describing the instruments, which bore a legend (i) identifying them as "Exempt Securities" under the Exchange Act, (ii) indicating that they were "exempt from the registration requirements of the Securities Act of 1933" and, (iii) stating that the securities "do not constitute an obligation of the United States

or any agency or instrumentality thereof *other than Fannie Mae.*" (emphasis added). The legend on the prospectuses indicated that the securities were obligations of an instrumentality of the United States—FNMA. Yet the fact that these words were also intended to inform the reader that the securities were the obligation of *no other* instrumentality of the Government does not mitigate their obvious premise, that FNMA is an instrumentality of the United States.

In addition, it has been held in this Court that FNMA is a "federal instrumentality." *Federal Nat'l Mortgage Assoc. v. Lefkowitz,* 390 F.Supp. 1364, 1368 (S.D.N.Y.1975). The Ninth Circuit, examining the legislative history of FNMA and its status as a government-sponsored private corporation, was "unable to find anything in the legislative history or in the statutes governing the operation of FNMA which supports the conclusion that Congress intended to strip FNMA of its status as a federal instrumentality." *Rust v. Johnson,* 597 F.2d 174, 178 (9th Cir.1979).

Since that is the case, the exemption in § 3(a)(2) applies to the securities at issue here. Thus, Kidder's motion to dismiss Unigestion's Eleventh and Twelfth Counterclaims will be granted.

### *Conspiracy Liability*
### *Under § 10(b) of the Exchange Act*

■ Kidder moves for judgment on the pleadings as to Unigestion's Third, Fifth, and Seventh proposed Counterclaims on the grounds that, as a matter of law, liability cannot arise for conspiracy under § 10(b) of the Exchange Act. Kidder bases this argument upon the Supreme Court's holding in *Central Bank of Denver N.A. v. First Interstate Bank,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), in which the Court held that there can be no liability for aiding and abetting under § 10(b). *Id.* at ——, 114 S.Ct. at 1447. Kidder argues that aiding and abetting is so close in nature to conspiracy that the foreclosure of one necessarily forecloses the other. Unigestion, on the other hand, maintains that conspiracy is sufficiently different in character from aiding and abetting that *Central Bank* does not preclude civil liability for conspiracy in violation of § 10(b).

A careful reading of *Central Bank* dictates that its holding be applied to conspiracy as well as to aiding and abetting. The *Central Bank* Court, following the reasoning generally applied in addressing issues arising under § 10(b), divided its analysis into two main issues. *Id.* at ——, 114 S.Ct. at 1445. First, the Court sought to determine the scope of conduct prohibited by § 10(b). *Id.* Second, the Court sought to determine the elements of the § 10b–5 private liability scheme. *Id.*

In determining the scope of conduct prohibited by § 10(b), the Supreme Court noted that as a rule in § 10(b) questions, "the text of the statute controls our decision." *Id.* See also *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Looking to the text in search of references to aiding and abetting, the Court found none. It stated that, "Congress knew how to impose aiding and abetting liability when it chose to do so. If, as respondents seem to say, Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Central Bank,* —— U.S. at ——, 114 S.Ct. at 1448 (citations omitted). Like aiding and abetting, conspiracy to violate § 10(b) is not prohibited by the statutory text of the 1934 Act. Other statutes do contain express provisions imposing liability for conspiracy, thus suggesting the Congress did not intend to do so. *See, e.g.,* 18 U.S.C. § 371 (criminal conspiracy statute); RICO, 18 U.S.C. § 1962(d) (conspiracy provision); Packers and Stockyards Act of 1921, 7 U.S.C. §§ 192(f), (g) (conspiracy provision); *In re Faleck & Margolies, Ltd.,* 89 Civ. 8548 and 90 Civ. 1356, 1995 WL 33631, at *12, 1995 U.S.Dist. LEXIS 970, at *36–37 (S.D.N.Y. Jan. 30, 1995); *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1098 (N.D.Cal.1994); *Tabankin v. Kemper Short–Term Global Income Fund,* No. 93C5231, 1994 WL 319185, at *2 (N.D.Ill. June 23, 1994). Thus, since "[i]t is inconsistent with settled methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text," *Central Bank,* —— U.S. at ——, 114 S.Ct. at 1448, the absence of a mention of conspiracy to violate § 10(b) is dispositive of the fact that no liability arises for such conspiracy.

Furthermore, *Central Bank* held that "even where the text of § 10(b) does not resolve a particular issue, we attempt to infer 'how the 1934 Congress would have addressed the issue had the 10b–5 action been included as an express provision in the 1934 Act,'" by looking to the express causes of action in the securities Acts. *Id.* at ——, 114 S.Ct. at 1448, *citing Musick, Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. ——, ——, 113 S.Ct. 2085, 2090, 124 L.Ed.2d 194 (1993). In searching for such mentions of aiding and abetting, the Court noted that "none of the express causes of action in the 1934 Act further imposes liability on one who aids or abets a violation," *id.* at ——, 114 S.Ct. at 1449, and held that "[f]rom the fact that Congress did not attach private aiding and abetting liability to any of the express causes of action in the securities Acts, we can infer that Congress likely would not have attached aiding and abetting liability to § 10(b) had it provided a private § 10(b) cause of action." *Id.* An application of the same analysis to conspiracy liability reveals no mention of conspiracy attached to the express causes of action in the 1934 Act. This further suggests that *Central Bank*'s logic applies to conspiracy as well as to aiding and abetting.

In completing its analysis of aiding and abetting liability, the *Central Bank* searched further for congressional intent to apply aiding and abetting tort liability to private causes of action in the securities Acts, placing emphasis on the distinction between primary and secondary liability. *Id.* at —— ——, 114 S.Ct. at 1451–52. The Court noted that:

> ... Congress did not overlook secondary liability when it created the private rights of action in the 1934 Act. Section 20 of the 1934 Act imposes liability on "controlling persons".... This suggests that "[w]hen Congress wished to create such [secondary] liability, it had little trouble doing so." Aiding and abetting is "a method by which courts create secondary liability" in persons other than the violator of the statute. The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional

choice with which the courts should not interfere.

*Id.* (citations omitted). Thus, the Court concluded, "it is not plausible to interpret the statutory silence as tantamount to an implicit congressional intent to impose § 10(b) aiding and abetting liability." *Id.* at ——, 114 S.Ct. at 1452. To determine if this segment of the *Central Bank* Court's analysis applies to conspiracy, then, it is necessary to determine if conspiracy gives rise to primary or secondary liability. Unigestion asserts that conspiracy gives rise to primary liability. Conspiracy, however, like aiding and abetting, has nearly universally been held to give rise only to secondary liability. *See Securities & Exch. Comm'n v. Coffey,* 493 F.2d 1304, 1315–16 (6th Cir.1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Faleck & Margolies,* 1995 WL 33631; *In re Caesars Palace Securities Litig.,* 360 F.Supp. 366, 386 (S.D.N.Y.1973); William H. Kuehnle, *Secondary Liability Under the Federal Securities Laws—Aiding and Abetting, Conspiracy, Controlling Person, and Agency: Common-Law Principles and the Statutory Scheme,* 14 J.Corp.L. 313, 314, 343 (1988) ("Conspiracy, like aiding and abetting, is a concept of secondary liability based on the conduct of the secondary defendant.")

It is not surprising that applying the *Central Bank* analysis to conspiracy liability yields the same result as that of aiding and abetting liability. It is true, of course, that conspiracy and aiding and abetting are distinct acts. At common law, a person is subject to aiding and abetting liability if he "does a tortious act in concert with the other or pursuant to a common design with him." Restatement (Second) of Torts § 876 (1977). In contrast, conspiracy liability attaches where a person "[k]nows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself...." *Id.* at § 876(a). Despite these differences, however, as this Court has noted:

> The requirements for aider and abettor liability and liability as a conspirator are similar—an aider and abettor must have knowledge of the primary violation and must have substantially assisted the pri-

mary wrongdoer, while a conspirator must have knowingly participated in the conspiracy.

*Epstein v. Haas Secs. Corp.,* 731 F.Supp. 1166, 1185 (S.D.N.Y.1990).

Since *Central Bank,* every court addressing this question has determined that conspiracy liability is not implied under § 10(b). *See In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 592 (9th Cir.1995); *In re Medimmune, Inc. Sec. Litig.,* 873 F.Supp. 953, 964 n. 8 (D.Md. Jan. 10, 1995); *Syntex,* 855 F.Supp. at 1098 (N.D.Cal.1994); *In re Gupta Corp. Sec. Litig.,* No. C 94–1517 FMS, 1994 WL 748988, at *21–22 (N.D.Cal. Dec. 6, 1994); *In re Rasterops Corp. Sec. Litig.,* No. C–93–20349 RPA, 1994 WL 618970 (N.D.Cal. Oct. 31, 1994); *In re Ross Systems Sec. Litig.,* No. C–94–0017–DLJ, 1994 WL 583114, at *3 (N.D.Cal. July 21, 1994).

Of the two cases cited by Unigestion in support of the continued viability of a conspiracy claim under § 10(b), one predates *Central Bank* and therefore can offer no guidance. *See Epstein,* 731 F.Supp. at 1185 (S.D.N.Y.1990). The other, *In re Medeva Securities Litigation,* No. 93 Civ. 4376, 1994 WL 447141 (C.D.Cal., June 3, 1994) has been effectively overruled within its own circuit by the *GlenFed* decision cited above.

Finally, as noted in the only case in this circuit to interpret *Central Bank* with regard to this issue, "To permit a private plaintiff to maintain an action for conspiracy to violate Rule 10b–5 would make *Central Bank of Denver* meaningless, since virtually every aiding and abetting claim can be alleged as a conspiracy claim." *Faleck & Margolies,* 1995 WL 33631, at *12, 1995 U.S.Dist. LEXIS 970, at *36.

For these reasons Kidder's motion for judgment on the pleadings as to Unigestion's Third, Fifth and Seventh Amended Counterclaims will be granted.

### Under § 12(2) of the Securities Act

Raising a similar argument, Kidder moves for judgment on the pleadings as to Unigestion's Twelfth Amended Counterclaim on the grounds that, as a matter of law, liability cannot arise for conspiracy under § 12(2) of the Securities Act. Because Kidder's motion

to dismiss this counterclaim will be granted on grounds that the securities at issue are exempt from regulation under the Securities Act, this argument need not be reached.

### Rescission Under § 29(b) of the Exchange Act

■ Kidder moves for judgment on the pleadings regarding Unigestion's Thirteenth Counterclaim, which asserts that, under § 29(b) of the Exchange Act, Unigestion may void any contracts with Kidder which are in violation of the provisions of the Exchange Act.

Courts have construed Section 29(b) to render any contract made in violation of the Exchange Act "voidable" at the option of the wronged party. *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 387, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970); *Occidental Life Ins. Co. v. Pat Ryan & Assoc., Inc.,* 496 F.2d 1255, 1266 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); *Gannett Co. Inc. v. Register Pub. Co.,* 428 F.Supp. 818, 830 (D.Conn.1977). An agreement to purchase securities that is induced by fraud is, under § 29(b), voidable at the will of the defrauded party. *See Gannett Co.,* 428 F.Supp. at 830. Kidder invokes the wisdom of Judge Weinfeld, who held that "only unlawful *contracts* may be rescinded, not unlawful *transactions,*" *Zerman v. Jacobs,* 510 F.Supp. 132, 135 (S.D.N.Y.), *aff'd,* 672 F.2d 901 (2d Cir.1981) (emphasis in original) but ignores Unigestion's bluntly stated claim that forward contracts to purchase securities were induced through fraud in violation of the anti-fraud provisions of the Exchange Act, thus rendering these contracts "unlawful contracts" under § 29.

Kidder's motion to dismiss Unigestion's Thirteenth Counterclaim will be denied.

### Failure to Plead Fraud With Particularity

■ Kidder moves to dismiss Unigestion's First through Fifteenth Counterclaims on the ground that Unigestion has failed to plead fraud with sufficient particularity.

Kidder points to the fact that Unigestion has, in the companion actions to this case, alleged that the other broker defendants

perpetrated fraudulent schemes identical to that which Unigestion attributes to Kidder. This statement can be given no import in the context of the instant motion. The pleadings in the companion actions, similar though they may be, shed no light on the legal sufficiency of Unigestion's fraud allegations against Kidder.

Unigestion has alleged that ACM/Askin purchased highly speculative and difficult-to-sell securities at an inflated price, in exchange for Kidder's purchases of other securities from the Askin Funds, and then misallocated portions of these purchases to Unigestion's account. This *quid pro quo* benefitted ACM and Kidder, but not Unigestion. Kidder maintains that the assertion that the securities were sold at an "inflated price" is insufficient to satisfy the requirements of Rule 9(b) and that Unigestion is required to state what the actual value of the securities was, as compared to the allegedly inflated price.

By this argument Kidder attempts to expand Rule 9(b) beyond its actual requirements. The present record indicates that the securities in question traded in a small, illiquid market. Unigestion cannot be expected to know the actual value of these securities at this stage. These securities were difficult for sophisticated experts to price even with complete information. Granted, in a more straightforward market situation, a bald allegation of "inflated price" might not satisfy the Rule, but the transactions at issue here were complicated and involved relatively exotic instruments.

In 1990, the Second Circuit affirmed a dismissal under Rule 9(b) of a complaint in which a customer alleged that a securities firm had sold a large block of her shares to a group of favored purchasers in a "corrupt bargain" by which the sale price was set "below that price that would have been obtained in the absence of the corrupt bargain." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). Interestingly, the Second Circuit found the Wexner's complaint to be inadequate to the requirements of Rule 9(b), but made no mention of price. Rather, the Court found the allegations inadequate because the complaint (i) did not set out any definite terms of the bargain (ii) did not explain what the defendant was to have gained from the fraudulent transaction, and (iii) conceded that plaintiff had known of the favorable price arrangement. *Wexner*, 902 F.2d at 172. In contrast, Unigestion has alleged definite terms: that Kidder sold certain specified CMO securities to Askin at specified higher-than-market prices and, in each alleged swap transaction, in exchange Kidder bought certain other specified securities, for specified prices. In each case Unigestion has alleged a matched pair of buys and specified the exact security, number of units and total price. Unigestion has alleged exactly what Kidder gained—the opportunity to unload a high-risk, illiquid, and difficult-to-sell tranche of an issue of derivative securities at a price that was higher than what it would have been had the price been negotiated at arms length on a strict market-value basis, with the knowledge that Unigestion was receiving no benefit from the swap. Finally, Unigestion has alleged that it was completely unaware of these transactions and that Kidder knew that Unigestion was unaware.

It has been noted that Rule 9(b)'s requirements may sometimes be relaxed as to matters peculiarly within the opposing party's knowledge when the complaining party is not able to provide certain details as to the alleged fraud. *See Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir.1974), *cert. denied* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Certainly, the correct market value of the allegedly overpriced securities is something that Kidder is in a unique position to know, since Kidder created the issues in question, and these CMO derivatives traded in a small, specialized, and sometimes illiquid market.

Unigestion has alleged that the swap transactions took place and that portions of the transactions were fraudulently attributed to Unigestion *ex post* and has pointed to trade tickets as indicia which would usually be available of the allocation of a trade executed by an investment manager and attributed to the manager's client, and has noted that the trade tickets are absent for all of the alleged swap transactions. Assuming the

truth of Unigestion's assertions, as the Court must under the standard for judgment on the pleadings, if an account was being maintained at Kidder on Unigestion's behalf, then Kidder must have had information that, at some point after the trading date, the transactions were attributed to Unigestion's account. Finally, since Kidder was the buyer of the alleged swap securities, it necessarily knew that Unigestion was not one of the sellers and therefore reaped no benefit from the swap transaction.

Kidder also maintains that the assertion that Unigestion's claim that portions of these swap transactions were fraudulently misallocated to Unigestion's account lacks sufficient particularity. Unigestion has alleged in each case a specific purchase or a specific security made on a particular date by ACM, with absolutely no contemporaneous documentary evidence that the trade was made on Unigestion's behalf as of the trade date, followed ultimately by the appearance of these trades on Unigestion's account. These factual assertions are sufficiently particular to satisfy the Rule.

Kidder argues next that Unigestion's allegation that Kidder made repeated material misrepresentations when it sold certain securities and stated that the purchase prices were "subject to downward revision based on a yield maintenance formula" lacks sufficient particularity. Although Unigestion alleges that the prices of these securities were never revised downward as was represented, Unigestion has not alleged that Kidder made the projection in bad faith, *see Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986); or that the projection was made by Kidder with knowledge that it was untrue. *See Crystal v. Foy,* 562 F.Supp. 422, 429 (S.D.N.Y.1983).

Kidder's Rule 9(b) motion will be granted in part, in that any part of any counterclaim premised on Kidder's allegedly fraudulent statement that the prices of certain securities was subject to downward revision will be dismissed.

■ Kidder also argues that Unigestion has failed to comply with the requirements of Rule 9(b) in its charge that Kidder's representation that some of the securities were "bearish" was fraudulent. Kidder's position,

simply put, is that no prediction as to the performance of a security could ever be entirely certain, and that it cannot be said that Kidder knew, with certainty, that the characterization was false. However, as already discussed above, the derivation of the instruments in question was so complex, and they traded in such a small market, that a prediction of their sensitivity to interest rate fluctuations was extremely difficult, if not impossible. Thus the unquantifiable possibility that the securities might have turned out to perform bearishly does not, without more, render Unigestion's claim of fraud insufficient under Rule 9(b). If Kidder made the written representation as Unigestion alleges, that writing necessarily conveyed the statement that Kidder was in a position to predict the performance of the instruments in question, and Unigestion has validly alleged that Kidder knew that it was in no such position. Unigestion's claim that the characterization of the securities as "bearish" was fraudulent is adequate under Rule 9(b).

In summary, regarding Rule 9(b):

1. Unigestion's allegation that Kidder's predictions as to downward price reduction were fraudulent fails to plead fraud with sufficient particularity;

2. Unigestion's allegation that Kidder's characterization of certain securities as "bearish" was fraudulent constitutes a sufficiently particular claim of fraud;

3. Unigestion's allegation that certain securities were fraudulently misallocated to its account by Kidder and ACM constitutes a sufficiently particular claim of fraud; and

4. Unigestion's allegations that fraudulent "swap" transactions were executed by Kidder and ACM, partially at Unigestion's expense, constitute a sufficiently particular claim of fraud.

Kidder's Rule 9(b) motion will be granted in part and denied in part, accordingly.

### *Prior Notification Was Not a Condition Precedent To ACM's Authority to Open Unigestion's Kidder Account and Conduct Business on Unigestion's Behalf*

Unigestion asserts that ACM/Askin was unauthorized to open a brokerage account on

its behalf with Kidder or to bind Unigestion to contractual commitments such as forward contracts or repurchase agreements. This assertion forms the basis for Unigestion's First Counterclaim and Second, Third, Fourth, Fifth, and Sixth Affirmative Defenses. Kidder moves to dismiss that counterclaim and those affirmative defenses.

Paragraph 5 of the IMA stated:

[Unigestion] authorizes ACM to purchase and/or sell securities, futures and other financial instruments for [Unigestion's] Account and to act for [Unigestion] in all matters necessary or incidental to such transactions. As a general matter, ACM may effect transactions with such brokers or dealers as may, in ACM's best judgment, provide prompt and reliable execution of the transactions at favorable prices, including commission rates and dealer markups....

This broad language, Kidder argues, granted Askin the authority to open an account with Kidder in Unigestion's name.

Unigestion counters that ¶ 10 of the IMA circumscribed the authority granted in ¶ 5, requiring notice as a condition precedent to Askin's exercising that authority. Paragraph 10 reads, in relevant part:

ACM will immediately notify [Unigestion] upon the occurrence of any event which would or could be material for the performance of the Agreement by ACM. Such a notification shall in particular be made in the event:

.    .    .    .    .

(c) ACM determines to set up any customer account or any sub-account to facilitate management of the Account.

Paragraph 10 provides that the required notice may be provided orally or in writing.

Unigestion thus asserts that ¶ 10(c) allowed ACM to open an account in Unigestion's name with a broker only after ACM had given Unigestion notice of its plans to do so. The purpose of the provision, Unigestion argues, was to provide it with the opportunity to object or to terminate the IMA if Unigestion was unwilling to assume the potential liability that could arise from an account in its name. David Chamberlain, a member of the Board of Directors and Executive Vice President of Unigestion affirmed that this was his understanding of the IMA.

Although ACM did indeed breach the IMA by failing to provide notice to Unigestion of its actions in opening the Kidder account, that failure did not divest ACM of the authority to open the account on Unigestion's behalf. Under New York law, the actual words of an agreement must guide its interpretation. *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir.1992); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990). Moreover, a contractual duty is not to be construed as a condition precedent unless the language of the contract clearly imposes such a condition. Thus, in *Toyomenka Pac. Petroleum, Inc. v. Hess Oil V.I. Corp.*, 771 F.Supp. 63, 67 (S.D.N.Y.1991), this Court held that a party's obligation to give notice under a force majeure clause, absent clear language making that notice a condition precedent, was not a necessary prerequisite to invoking the force majeure clause under the contract. No section of the IMA expressly conditions the grant of authority found in ¶ 5 on the notice requirement set out in ¶ 10. Thus, although ¶ 10 placed ACM under the contractual duty to give notice to Unigestion, that paragraph did not reduce ACM's grant of authority under ¶ 5. Mr. Chamberlain's testimony is irrelevant, since the IMA was negotiated by sophisticated parties at arms' length and its language is not ambiguous. *See New Bank of New England, N.A. v. Toronto–Dominion Bank*, 768 F.Supp. 1017, 1022 (S.D.N.Y.1991).

Given ACM's authority to open an account on Unigestion's behalf with Kidder, ACM's breach of its own obligations had no affect on Kidder's rights or Unigestion's responsibilities with regard to their own relations. Kidder bore no responsibility to notify ACM of the establishment of the account, since ACM possessed full authority to open the account on ACM's behalf. Similarly, Kidder bore no obligation to verify ACM's authority, since, "where an authorized agent fails faithfully to adhere to his principal's instructions, the consequences of that dereliction are not visited upon the third party,

and any recourse which the principal may have would be against the agent." *Compagnia Italiana Transoceanica Di Navegazione, S.p.A. v. Hugo Neu & Sons Int'l Sales Corp.,* 557 F.Supp. 507, 511 (S.D.N.Y.1983). Unigestion's arguments regarding ACM's lack of authority thus generally have no bearing on Kidder's claims.

■ The February 1 Trade presents an exception to the foregoing analysis. The Trade, made prior to any of Unigestion's assets being "place[d] under the management of ACM," per the words of the IMA, thus fell outside the ambit of ACM's authority. The language of the IMA, in which ¶ 5 grants "ACM complete discretion in the investment and reinvestment *of the Account,*" establishes ACM was authorized to invest only whatever was in the Account. Since nothing was in the Account on February 1, ACM was not authorized to invest or reinvest.

For these reasons, Kidder's motion to dismiss Unigestion's First Counterclaim and Second, Third, Fourth, Fifth, and Sixth Affirmative Defenses will be granted with regard to all transactions except the February 1 Trade.

### Leave to Replead

The Counterclaims which have been argued here are Unigestion's Amended Counterclaims, submitted to the Court subsequent to a fulsome set of original counterclaims. Prior to this Court's deeming, on June 21, 1995, that Unigestion's Answer was amended, these Counterclaims were served upon Kidder as Proposed Counterclaims, and both sides amply briefed the question of their validity. Those counterclaims and defenses are dismissed in whole or in part with prejudice.

### Conclusion

Kidder's motion for judgment on the pleadings dismissing Unigestion's Amended Counterclaims is hereby granted in part and denied in part, as follows:

Kidder's motion for judgment on the pleadings as to Unigestion's First Counterclaim and Second, Third, Fourth, Fifth, and Sixth Affirmative Defenses based upon lack of authority is hereby granted with regard to all transactions except the February 1 Trade, regarding which Kidder's motion is denied.

Kidder's motion for judgment on the pleadings as to Unigestion' Third, Fifth and Seventh Amended Counterclaims based on conspiracy liability under § 10(b) of the Exchange Act is hereby granted.

Kidder's motion for judgment on the pleadings as to Unigestion's Eighth, Ninth and Tenth Amended Counterclaims based on notification under §§ 15(c)(3) and 15C(b)(7) is hereby granted.

Kidder's motion for judgment on the pleadings as to Unigestion's Eleventh and Twelfth Counterclaims on the ground that the securities in question are exempt from the provisions of the Securities Act is hereby granted.

Kidder's motion for judgment on the pleadings as to Unigestion's Thirteenth Counterclaim for rescission under § 29(b) of the Exchange Act is hereby denied.

Kidder's motion for judgment on the pleadings as to Unigestion's First through Fifteenth Counterclaims pursuant to Rule 9(b) for failure to plead fraud with particularity is:

1. granted with respect Unigestion's allegation that Kidder's predictions as to downward price reduction were fraudulent;

2. denied with respect to Unigestion's allegation that Kidder's characterization of certain securities as "bearish" was fraudulent;

3. denied with respect to Unigestion's allegation that certain securities were fraudulently misallocated to its account by Kidder and ACM; and

4. denied with respect to Unigestion's allegations that fraudulent "swap" transactions were executed by Kidder and ACM at Unigestion's expense, without Unigestion's knowledge, to the benefit of Kidder and ACM but not Unigestion.

Those Amended Counterclaims and Affirmative Defenses of Unigestion's dismissed in

503

whole or in part hereby are dismissed with prejudice.

It is so ordered.